**UNITED STATES GYPSUM COMPANY, Appellant,**

v.

**The GREIF BROTHERS COOPERAGE CORPORATION, Appellee.**

**No. 18826.**

United States Court of Appeals Eighth Circuit.

Jan. 31, 1968.

Rehearing Denied Feb. 23, 1968.

George K. Cracraft, Jr., Helena, Ark., for appellant and filed brief.

William H. Daggett, of Daggett & Daggett, Marianna, Ark., for appellee and filed brief.

Before VOGEL, Chief Judge, and GIBSON and LAY, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

The District Court, The Honorable Oren Harris, for the E. D. of Arkansas entered summary judgment on February 23, 1967 in favor of the plaintiff-appellee, The Greif Brothers Cooperage Corporation, and against the defendant-appellant, United States Gypsum Company, in a quiet title suit and voided a purported "Island Deed" from the State of Arkansas.

This is a diversity case, in a requisite jurisdictional amount and the law of Arkansas applies. We affirm.

These parties are not strangers to riverland litigation nor to each other. In 1963 Gypsum brought suit in the Federal District Court to enjoin Greif from cutting timber on lands in Sections 22 and 23, Township 11 S., Range 1 W., Desha County, Arkansas, and to quiet title thereto.

A decree was entered by the District Court on October 24, 1963 holding the land in the North Half of Section 23 ad-

jacent to Long Lake belonged to Gypsum [this land is not in controversy in this suit] and holding that land in the Southwest Quarter of Section 23, and land in Sections 21 and 22 together with accretions, relictions or reformations of submerged lands lying South of said Sections and North of the main channel of the Mississippi River belonged to Greif. This 1963 decision was appealed to the Eighth Circuit and affirmed in an opinion reported at 341 F.2d 167 (1965).

The land here in controversy lays along the North bank of the Mississippi River and North of the main channel, sometimes called "The Steamboat Channel", of that river, the middle of the channel being the State boundary line between Arkansas and Mississippi.

The Township was first surveyed in 1846 by the General Land Office, and Sections 21, 22, 23, 26 and 28 of Township 11 were platted as fractional sections being bounded on the South by the riparian bank of the Mississippi River and on the North by what was known as Long Lake. Sections 28, 27 and 26 lie directly South of Sections 21, 22 and 23 respectively.

The Mississippi River had eroded Northward into Sections 21, 22 and 23, and reached in its line of maximum recession, or what is referred to in the record as the "northernmost chute or depression", in about 1914. The Mississippi River then reversed its migration to the North and proceeded back in a southerly direction thus exposing additional lands in Sections 21, 22 and 23 and also causing the appearance of land south of the original survey, which is now for the main part in Sections, 28, 27 and a small part in Section 26. Also the waters in Long Lake receded and land formed in its old bed.[1]

The crucial point of the present litigation is whether the lands forming on what was the South boundary of fractional Sections 21 and 22 and on into Sections 28, 27 and 26 were accretions or relictions, or were independent islands having no connection with the North riparian bank of the Mississippi River as that bank was constituted in Sections 21, 22

1. Hand sketch of area in question:

and 23 and as is now constituted in Sections 28, 27 and 26.[2]

On May 12, 1954 George K. Cracraft, Jr., Gypsum's counsel, filed his application to purchase the purported island lands. A special surveyor was appointed by the Commissioner of State Lands on that same day to survey the lands South of the meander line of the 1846 G.L.O. survey. The land was surveyed and platted with reference to the survey of adjacent lands by the extension of the Township, Range and Section lines to the south. The surveyor filed his survey notes on July 15, 1954 and was paid the sum of $881.13 for survey costs by Mr. Cracraft on that date, but Cracraft did not request or receive his deed from the State Land Commissioner until December 10, 1965, which was after the termination of the 1963 litigation in this Court (Rehearing denied February 23, 1965). He then conveyed this same property to Gypsum the following day.

█ The statutes respecting the acquisition of title to island lands owned by the State of Arkansas, Ark.Stat.Ann. §§ 10–601 to 10–607, were repealed in 1959 and re-enacted with substantial changes which provided for competitive bidding on these types of lands.[3] The old statutes in force at the time of Cracraft's application, however, gave the applicant Cracraft a vested right to acquire the so-called "island lands" which the 1959 repeal and re-enactment could not affect. United States Gypsum Company v. Uhlhorn, 232 F.Supp. 994 (E.D.Ark.1964). Cracraft, who is here treated as the agent and counsel for Gypsum, therefore had a vested right to receive on behalf of Gypsum the purported state title to the lands now in controversy, and Gypsum would be vested with an equitable interest in whatever title the State had in these lands.

The Commissioner of State Lands found that the area was comprised of four islands, designated upon his plat and survey as Cypress Bend Islands No. 1, No. 2, No. 3 and Caulk Neck Peninsula Residue Island, lying in Sections 21, 22, 23, and in 26, 27, 28 and 29 of Township 11, by the extension of the Section, Township and Range lines. The Commissioner also found that the islands were the property of the State subject to sale, save for that portion of the island lands that were North of the meanders of the 1846 G.L.O. survey. All of Island 1 and most of Island 2 and approximately 25 per cent of Island 3 and a small part of the Caulk Neck Island are all North of the meander lines of the 1846 survey.

On April 6, 1967, the Greif Brothers Cooperage Corporation filed a complaint in the United States District Court for the Eastern District of Arkansas asking that the "Island Deed" to George Cracraft, Jr., and his subsequent conveyance to United States Gypsum be canceled and set aside and that Greif's title to lands it owned that were purportedly conveyed by the "Island Deed" be forever quieted in it. Greif claimed to be the owner of:

"Frl. all of Section 21; Frl. SW ¼ of Section 22 and Frl. SW ¼ of Section 23, all in T. 11 S., R. 1 W., togeth-

2. By Ark.Stat.Ann. § 10–202,
 Lands formed in navigable waters within the State and within the original boundaries of a former owner of land upon such waters shall belong to and the title thereto shall vest in such former owner, his heirs or assigns, or successor in title.
 The preamble of that Act states that under existing laws (before enactment of this statute) if land is washed away from a riparian bank and reforms as an island in a navigable stream within the original boundaries of the former owner it belongs to the State.

3. The repeal and re-enactment in 1959 was passed as emergency legislation. The enacting clause of the emergency phase of the statute reads in pertinent parts as follows:
 "It has been found and is declared by the General Assembly of the State of Arkansas that the failure of existing law to require competitive bidding for the class of lands contemplated herein has resulted in a serious loss of revenue to the State and is discriminatory as between buyers of various classes of state lands;"

er with the area within the following described boundaries, to-wit:

"Beginning on the top of the old River Bank (by the expression 'old river bank' is meant that portion of the section as originally surveyed which has not heretofore caved into the Mississippi River) where the South line of Section 21 strikes the same, thence in a Southeasterly direction at right angles to said old river bank to a point in the center of the main channel of the Mississippi River as now located, thence in a Northeasterly and Easterly direction following the center of said main channel to a point due South of the Southeast corner of the Southwest Quarter of Section 23, thence in a Northerly direction at right angles to the center of the main channel of the river to a point on the old river bank through said Southwest Quarter of Section 23, thence in a Northwesterly and Southwesterly direction following the meanderings of said old river bank to the point of beginning,

by virtue of (1) a decree of Desha County Arkansas Chancery Court dated October 21, 1940 * * * ", (2) a deed from the heirs of B. O. Zellner, (3) a court decree of 1963 entered in the United States District Court, and (4) by consecutive tax payments since 1940.

The Chancery Court's decree quieted title to the above described lands in Arkamiss Timber Company and Greif against C. W. Hunter Company. The Chancery Court declared the plaintiffs as owners of the land described, and noted "That plaintiffs and those under whom they claim, have paid all taxes assessed against same for a period of more than seven years under color of title." Arkamiss Timber Company conveyed its interest in the above described property to Greif on October 15, 1940, by quit claim deed.

The land embraced by the foregoing description includes: all the land now in controversy with the exception of a comparatively small tract of approximately 19.7 acres in the Northeast ¼ of Section 26, independent title to which is asserted through a predecessor, J. U. Fehr, and the payment of taxes thereon by Fehr and Greif for a period of more than 10 years. Fehr conveyed his interest by special warranty deed of July 19, 1965.

In the 1963 suit Gypsum claims it was only litigating title to lands in Section 22, lying North of the meander line of the 1846 survey. It asserted title thereto by virtue of a later deed from the heirs of B. O. Zellner. Greif claimed title to all of the land by virtue of the Chancery decree of 1940, and a quit claim deed of August 29, 1940 from A. C. Zellner individually and as attorney-in-fact for the heirs of B. O. Zellner, the common source of title as between the parties in the 1963 litigation. The land conveyed by the Zellner deed to Greif is described as follows:

"All that part of Sections 21 and 22, Township Eleven South (T11S), Range One West (R1W), lying and being situated South of the Northernmost Chute or depression through said sections and North of the main channel of the Mississippi River as same is now located.

"It being the intention of the parties hereto to convey title to all land which has formed on that portion of said sections which between the time of the survey of 1846 caved into the Mississippi River and subsequently reformed, together with any accretions or additions thereto either by way of accretion, reliction, or reformation of submerged lands and shall in no wise whatever convey any interest in any portion of said sections which, has not, subsequent to the original township survey, caved into the Mississippi River."

The claim of Greif in the 1963 suit did extend beyond and constituted an enlargement on the original complaint of Gypsum. The District Court, however, in the 1963 litigation in conforming the decree to the evidence quieted title in Greif to the following property:

" * * * all that part of Sections 21 and 22, township 11 South, Range 1 West, lying and being situate South of the northernmost chute or depression through said Sections and North

of the main channel of the Mississippi River, as same is now located * * *." 4

The Court in that same litigation quieted title to Gypsum to all that part of Section 22 lying north of the northernmost chute or depression through said Section and to the North ½ of Section 23, which included the relictions allotted to the Southwest quarter of Section 23 insofar as they extend into what would have been the North Half of Section 23 if the township, range and sections of the original government survey were extended.5 The title to the Southwest ¼ of Section 23 was quieted in Greif and title to the Southeast ¼ of Section 23 was quieted in Gypsum (in addition to other lands not relevant to this litigation).

In affirming the 1963 decree this Court determined that the Zellner deed of 1940 to Greif was a valid conveyance of the lands described therein and approved the District Court's finding that tax payments on the land were sufficient under the applicable Arkansas Statutes, §§ 37–102, 37–103, to vest an indefeasible fee simple title in Greif.

Greif had paid taxes from 1941 until the present time on the land in Sections 21, 22 and 23 together with the accretions thereto. The tax records show that the taxes were assessed and paid on Sections 21, 22 and 23 and accretions. For the year 1952, Section 22 with accretions is listed as covering 1010 acres, Section 21 is listed at 700 acres and the Southwest ¼ of Section 23 at 340 acres,—this shows that additions and accretions or relictions would have to extend beyond the original section lines into adjoining sections.

The tax receipt for 1965 shows that Greif paid taxes on:

1. 160 acres in the fractional NE ¼ of sec. 26;

2. 320 acres in the W ½ of section 26;

3. 640 acres in all of section 21;

4. 440 acres S. of the northernmost chute in section 22;

5. 160 acres of the SW ¼ of section 23;

6. 640 acres for all of section 27.

The greater part of the area now claimed by Gypsum lies in Sections 27 and 28 with the balance located in Sections 26, 21, 22 and 23 South of the meander line of 1846.

Greif also maintains that the "Island Deed" was void and of no effect because the land purportedly conveyed thereunder did not form as an island, and was not subject to sale as such, but was formed by accretions to the riparian lands on the North bank of the Mississippi and were declared to be such in a decree by the United States Court for the Eastern Dis-

4. In our opinion in the 1963 case the "Northernmost Chute" is stated as coinciding with the 1914 shoreline of the Mississippi River, and was chosen as the boundary line of the Lulu Zellner property on the North and the Greif Brothers property on the South in their joint survey of 1947.

5. In the 1963 appeal this Court found that "Gypsum was invested with title by operation of the aforecited Arkansas statutes [§§ 37–102, 103] which make payment of taxes under color of title equivalent to adverse possession." Gypsum and its predecessors had paid taxes for 15 years under the sectional designation of "Frl.NW¼ of Sec. 23, and the NE¼ of Sec. 23." We recognized in the 1963 opinion at p. 171 of 341 F.2d,

"The valid acquisition by Greif Bros. of title to land described as 'SW ¼ of Section 23, together with all accretions and relictions' would without question convey ownership to both existent as well as subsequently formed alluvion riparian to the original grant. (Citations omitted). As an adjunctive right of riparian ownership, ordinarily the payment of taxes by Greif Bros. pursuant to the assessment and description of the original tract of land designated on the tax records as 'Frl. SW ¼ & Accr. Sec. 23' would constitute payment on the disputed accretions provided the riparian rights had not been severed by separate conveyances or assessment. Bryant v. Chicago Mill & Lumber Co., 120 F.Supp. 463, 467 (E.D.Ark.1954), aff'd 216 F.2d 727 (8 Cir. 1954)."

trict of Arkansas entered January 3, 1941, in case No. 1029 entitled "United States of America v. 594.03 Acres of Land in Desha County Arkansas: and Arkamiss Timber Company, et al." That case concerned a condemnation proceeding instituted by the government for a proposed cutoff to the Mississippi River. The Special Master appointed by the Court made findings as to the ownership of land taken, either original land or accretion. That decree described Tract Z–1 Heirs of B. O. Zellner as: "All of Section 23 lying within Caulk's Neck cutoff Right-of-way together with river-side accretions thereto (43.6 acres) extending into Section 26 between Tracts A–1 and A–4 above described, excepting that part thereof owned by the Arkamiss Timber Company." The decree also refers to Tract Z–4 Heirs of B. O. Zellner as: "A triangular parcel lying within the Right-of-way of Caulk's Neck Cut-off adjacent to the Northwest boundary of the accretions to Tract A–1 and lying for the most part to the South of Section 22, containing in all 17.20 acres." An examination of a plat prepared by H. S. Nelson of the United States Engineers on March 12, 1939, shows that Tract Z–1 referred to above extends into the area purportedly conveyed by the "Island Deed." Likewise, the accretions to Tract A–1 referred to in describing Tract Z–4 is shown to be a 189.7 acre tract within the area purportedly conveyed by the "Island Deed."

Greif further claims that even if the area now in question did form as an island, the State of Arkansas was divested of any title thereto by reason of its acceptance of taxes paid by Greif on the land since 1941 so that a grant or conveyance by the State to Greif is presumed as a matter of law; hence, the State could not validly convey by "Island Deed" the land in question. This issue was raised by Greif in the District Court, but was not passed upon by the Court.

The District Court found that the area in controversy was the same as that involved in the 1963 action between Gypsum and Greif. The District Court noted that the 1963 judgment and the opinion of this Court in affirming that judgment, held the Zellner Deed effectively conveyed to Greif all of Sections 21 and 22 South of the northernmost chute or depression to the main channel of the Mississippi River, and referred to the lands as "accretions, relictions and reformations", and that Greif paid taxes on the land pursuant to a valid description for a period exceeding the statutory requirement to vest it with an indefeasible fee simple title. The District Court found that Gypsum was thoroughly aware of this previous judgment and its subsequent affirmance at the time it made its proffer to the Commissioner of State Lands and obtained its "so-called Island Deed."

The District Court in the case at bar adopted the findings of fact and conclusions of law entered in the 1963 litigation between Gypsum and Greif in the District Court, and voided the purported "Island Deed" to George Cracraft, Jr., and his subsequent conveyance to Gypsum; title was quieted in Greif pursuant to the description set out in Greif's complaint, the Court noting the 1963 litigation did consider and its decree embraced " * * * 'all that part of Sections 21 and 22, Township 11 South, Range 1 West, lying and being situated south of the northernmost chute or depression through said sections and north of the main channel of the Mississippi River as same is now located.' * * * ".

■ Gypsum says that the District Court erred in granting summary judgment and asserts that summary judgment was not a proper means of disposing of the case at bar because there was a genuine issue of material fact to be decided which was not, or could not have been decided in the previous litigation between the parties; and that collateral estoppel or res judicata is not applicable to its claim to the lands conveyed by the "Island Deed". Of course, if there remained for decision a genuine issue of a material fact, summary judgment would not be appropriate. Sartor v. Arkansas Natural Gas Corp., 321 U.S.

620, 64 S.Ct. 724, 88 L.Ed. 967 (1944); Jacobson v. Maryland Casualty Co., 336 F.2d 72 (8 Cir. 1964). And the movant has the burden of establishing the lack of a genuine issue. *Jacobson,* supra. We, therefore, examine the pleadings and supporting records to ascertain if all the material facts are concluded either on the pleadings, supporting affidavits, exhibits and court records.

■ First, Gypsum asserts that the lands in controversy are not the same lands as previously litigated. However, the District Court found otherwise and its finding of fact on this issue is certainly "not clearly erroneous" and must stand.

Second, Gypsum asserts that summary judgment should not have been entered because the crucial question of how the lands in question formed was not determined in the previous litigation, and that the findings of fact and conclusions of law made by the District Court in the 1963 litigation, and adopted by the District Court in the case at bar, do not touch on the issue because it was not necessary to so decide under the issues presented in the 1963 litigation.

The only finding or conclusion of law touching on the question of formation was Conclusion of Law I: "That defendant's deed [Greif's], being of record and in plaintiff's [Gypsum's] chain of title, constitutes notice to the plaintiff that the accretion or re-formed lands South of the northernmost chute had been severed from the riparian lands in place in Section 22", and further contends that on appeal the question was likewise not determined.

■ The District Court in the case at bar noted that the opinion of this Court in hearing the appeal of the 1963 judgment referred to the lands in question as "accretions, relictions and reformations", but there was nothing in the opinion of this Court which indicates which of these processes gave rise to the area in controversy to the exclusion of the other processes, nor was it necessary to its decision to do so. However, any additions, accretions, or relictions would inure to

the benefit of the riparian owner Greif and not Gypsum. But, a reformation of submerged lands not within the original boundaries of the riparian tract would, if formed as an island in a navigable stream, belong to the State of Arkansas under Ark.Stat.Ann. § 10–601. According to Arkansas law, as enunciated in Cummings v. Boyles, 411 S.W.2d 665 (Ark.1967), when the land formation begins with a bar or an island detached and away from the shore, and by a gradual filling in of soil or by gradual recession of the water the space between the bar or island and mainland is joined together, it is not an accretion to the mainland and does not thereby become the property of the owner of the riparian tract.

■ In our view, the 1963 case was tried and considered on the basis that the lands concerned were either land in place or additions, accretions or relictions to land in place, and at least any lands now contiguous to Sections 21, 22 and 23 lands were intended to be and were included in that decree. It is, of course, possible that all of these lands were island lands, being reformations of submerged areas, but it appears that these lands are dealt with in the prior cases as being land in place with accretions or relictions. However, in any event, Gypsum could have raised the issue that these lands or some of them were not additions, accretions or relictions, but were of independent origin so as to constitute island lands. This Gypsum should have done if it desired to effectuate its vested interest in the State title to these lands. The court decree embraced all lands South to the main channel of the Mississippi River and unquestionably covered the lands now in dispute, which lands evidently at that time were part of and contiguous to the land to the North. It would appear, therefore, that the disputed lands were covered in the 1963 litigation, and that the ownership as between the parties is res judicata.

Third, Gypsum contends that summary judgment should not have been entered foreclosing its claim under the "Island Deed" because the title it is now assert-

ing was derived after the rendition of the 1963 judgment and its final determination on appeal. Gypsum says it cannot be estopped from asserting such a subsequently acquired title from another source. In the previous litigation, Gypsum asserted title only as Zellners' grantee. There would be nothing to prevent the State of Arkansas from asserting its title against Greif, and Gypsum is now asserting title derived through the State. The decision in the previous suit could not and did not extinguish the State's ownership to any land herein involved. Further, there was no obligation on Gypsum to plead the State's title to the area now in question in the 1963 litigation, especially since that area was not in question then; and if it were, Gypsum would still not be estopped from asserting its title subsequently derived from a different source.

■ The general law of judgments set out in 50 C.J.S. Judgment § 738 reads:

"A judgment in an action to quiet title bars subsequent litigation on the same cause of action between the same parties or their privies, and is final and conclusive not only as to all issues actually involved and determined, but also as to such matters as should have been litigated and determined in the former action."

Arkansas law is in accord. Lewis v. Webb, 208 Ark. 1084, 189 S.W.2d 376 (1945). As noted in Fawcett v. Rhyne, 187 Ark. 940, 63 S.W.2d 349, at p. 353 (1933), "That rule has been often announced by this court to the effect that a judgment or decree of a court of competent jurisdiction operates as a bar to all defenses, either legal or equitable, which were interposed or which could have been interposed in the former suit." *Fawcett* did hold that if a particular point was not in issue, the doctrine of res judicata would not apply. However, the technical rules on issues and construction of the pleadings that were applied by the Arkansas Supreme Court in 1933 would not apply under the Fed.R.Civ.P. to a trial in a federal district court.

■ We recognize that res judicata would not apply to a title acquired subsequent to the judgment and that under Arkansas law a subsequently acquired title from another source could be asserted in a subsequent suit between the same parties involving the same land. Wadley v. Leggitt, 82 Ark. 262, 101 S.W. 720 (1907); Barton v. Meeks, 209 Ark. 903, 193 S.W.2d 138 (1946); Baumgartner v. Rogers, 233 Ark. 387, 345 S.W.2d 476 (1961). But whatever title the State may have had, if any, was applied for in 1954 and a vested interest acquired by Gypsum in it, and it could have been asserted in the 1963 litigation. As noted in Baumgartner v. Rogers, supra, where the record and pleadings show that the same parties and the same land were involved in prior litigation, a prima facie case is made for the application of the doctrine of res judicata and the party asserting a subsequently acquired title has the burden of proof of establishing that title as superior to the one recognized and quieted in the prior litigation. It would also appear that the party asserting an after acquired title would have the burden of proving the title was actually an after acquired title and not one held in reserve to be perfected and used after the prior unsuccessful litigation is concluded.

■ We also recognize that under Arkansas law and the law generally, that a party in a quiet title suit must rely on the strength of his own title and not upon the weakness or defects of the adversary's title. Greif Bros. Cooperage Corp. v. United States Gypsum Co., supra; Bryant v. Chicago Mill & Lumber Co., 216 F.2d 727 (8 Cir. 1954).

But the answer to Gypsum's contentions is that it, through its agent and attorney had a vested right in the purported Island Title that was applied for in 1954, and the legal title thereto could have been issued at any time after it paid for the survey costs in 1954. That "Island Deed" shows a previous consideration of $1,428.61 plus the survey cost of $881.13 had been paid by Cracraft, counsel for Gypsum, and an additional amount

of $1,045.76 was paid upon issuance of the deed. This made a total consideration of $3,355.50 for "the appraised value of said islands containing 1118.5 acres", part of the consideration having been paid long prior to the commencement of the 1963 litigation between the same parties.

Gypsum's contention that it could not litigate its Island Title is not well taken. This title was applied for in 1954 and Gypsum through its counsel secured a vested right in securing that title. United States Gypsum Company v. Uhlhorn, 232 F.Supp. 994 (E.D.Ark.1964). Greif in the 1963 suit asked for affirmative relief in quieting its title as outlined in the Zeilner deeds which did include lands South to the main channel of the Mississippi River. Gypsum would have to know by the record and from the facts asserted in the 1963 litigation that Greif was claiming title to the now disputed lands. Gypsum should have asserted that interest as an affirmative defense to Greif's cross-claim for equitable relief in quieting its title. Not having done so, we think Gypsum is bound by the 1963 decree, and the issue as to ownership of the lands as between Greif and Gypsum is res judicata.

Greif also claims it has good title to the lands in question by virtue of the payment of taxes on these lands for periods required under the Arkansas Adverse Possession and Tax Title Statutes, §§ 37–102 and 37–103; and that the legal presumption of a lost grant is applicable to this situation.

 This issue was not passed upon directly by the District Court, but we think it has merit and could serve as a basis for affirmance. In appellate review the District Court judgment may be sustained, if a right result is reached, on theories other than the one applied by that court. City of Grandview, Missouri v. Hudson, 377 F.2d 694, 696 (8 Cir. 1967); Employers Mutual Casualty Company v. Hinshaw, 309 F.2d 806 (8 Cir. 1962). We think, therefore, that a discussion of this alternate contention is in order.

Gypsum argues that tax payments made by Greif, allegedly on the lands in question, could not serve to divest the State of its title to the island land conveyed pursuant to the "Island Deed." The District Court in rendering its decision quoted this Court's statement regarding the 1963 litigation: "And, finally, the District Court's finding that Greif Bros. paid taxes on this land pursuant to a valid description for a period exceeding the statutory requirement to vest it with an indefeasible fee simple title is amply supported by the evidence." We re-affirm that statement. Greif did pay taxes on the disputed land for a period of over 15 years on most of the land involved, and at least over 7 years on all accretions or relictions that were added from time to time to the tax rolls. The assessment and taxation by sections or sectional quarters and accretions is good and sufficient to bring into operation the Arkansas Adverse Possession & Tax Title Statutes, §§ 37–102, 37–103, absent a severance of the accretions or a more definite assessment of the accretions or relictions by platting and extending the sectional, township, and range lines. Greif Bros. Cooperage Corp. v. United States Gypsum Co., 341 F.2d 167, 171 (8 Cir. 1965). Also see footnote No. 5.

The record shows that Greif paid taxes on Sections 21, 22 and 23 since 1941; that its payment of taxes on the SW ¼ and accretions of Section 23 did not prevail against a payment of taxes by Gypsum on a more definite assessment on quarter sectional lines, but the other lands south of the designated sections were assessed and treated as accretions. Gypsum had paid no taxes on this land, and, of course, we do not have the issue of a duplicate tax payment on a superior description as was involved in the N ½ of Section 23 in the 1963 litigation.

In 1952 and continuing to date, the tax payments by Greif generally covered increased acreage attached to Sections 21, 22 and 23 that would have to extend into the land area south of those sections and

into what has now been platted as sections or fractional sections 26, 27 and 28.[6]

This payment of taxes under the Arkansas Statutes for the period involved would vest Greif with an indisputable fee simple title under ordinary circumstances. A further elaboration on this point will be made in connection with Gypsum's last contention that Greif must show continued actual possession of the land to invoke the doctrine of presumption of a lost grant.

[redacted] It appears neither fair nor equitable to allow Gypsum to hold back for 11 years on its purported "Island Deed" application while Greif paid taxes on this property, and then after partially unsuccessful litigation, perfect its vested interest in the disputed lands by completing its so-called "Island" acquisition. Nor does it appear permissible for the State to accept taxes on this land for an extended period of time when it had, in an ex parte proceeding on application of Gypsum, determined the disputed area to be island land.

[redacted] We acknowledge the State's right to public lands and that adverse possession does not run against public property, but the disputed land here was not used for public purposes nor set aside for public use, but was the kind of land the State desired to have placed on the tax rolls either as accretions or relictions, or as island lands. It is true the State did acquire some additional revenue in selling the disputed area as island lands, but it does not appear that the State should be able to both assess and collect taxes on the land and still hold title to it under the circumstances of this case.

Finally, Gypsum contends that for Greif to invoke the presumption of a lost grant from the State to the lands in dispute there must be continued actual possession of such land coupled with tax payments under a valid legal description, if that possession could have had a legal inception. Gypsum notes that the lands in question are undisputably wild, unoccupied and in the possession of no one.

[redacted] The tax descriptions under consideration are sufficiently definite to invoke the operation of the Ark.Stat.Ann. § 37–102, which says: "Unimproved and unenclosed land shall be deemed and held to be in possession of the person who pays taxes thereon if he have color of title thereto * * * and shall have paid

6. The record shows 1952 taxes were assessed and paid by Greif as follows:

| | |
|---|---|
| Section 22 | 60 acres |
| E ½ Section 22 | 500 acres |
| Frl. SW ¼ & accr. Section 22 | 450 acres |
| | 1010 acres |

This total, 1010 acres on a fractional section plus accretions only covers that part of Section 22 south of the northernmost chute (approximately 200 acres are north of that chute and are not included in the above assessments). Therefore, on this assessment more than 570 acres would have to be in the extension of Section 22 into Section 27, and would cover all of fractional Section 27 as shown on the plat.

The record further lists the SW ¼ and accretions in Section 23 at 340 acres —this is 180 acres over the quarter section designated area and includes accretions or relictions most of which however, would be in the N ½ of Section 23.

The record also shows fractional Section 21 at 700 acres. This would have to include accretions, relictions and additions in Section 28 to the south. In 1966 Greif paid taxes on the 1965 assessment as follows:

| | |
|---|---|
| Fractional Northeast Quarter (NE ¼), Section 26, Township 11 South, Range 1 West | 160 acres |
| West Half (W ½) Section 26, Township 11 South, Range 1 West | 320 acres |
| Fractional all Section 21, Township 11 South, Range 1 West | 640 acres |
| Fractional all South of Northernmost Chute, Section 22, Township 11 South, Range 1 West | 440 acres |
| Fractional Southwest (SW ¼) Quarter, Section 23, Township 11 South, Range 1 West | 160 acres |
| All Section 27, Township 11 South, Range 1 West | 640 acres |

such taxes for at least seven [7] years in succession * * *." Brasher v. Taylor, 109 Ark. 281, 159 S.W. 1120 (1913) held payment of taxes for the full period of time (7 years) and under the conditions of the statute is equivalent to possession, and constitutes an investiture of title, citing Towson v. Denson, 74 Ark. 302, 86 S.W. 661 (1905).

Under Ark.Stat.Ann. § 37–103 the payment of taxes on wild and unimproved land for 15 consecutive years " * * * shall create a presumption of law that such person, or his predecessor in title, held color of title to said land prior to the first payment of taxes made as aforesaid, and that all such payments were made under color of title."

 This statute has been construed according to its plain terms. Payment under the statute raises the presumption of law that the payer or his predecessor held color of title prior to the first payment of the taxes. Bryant v. Chicago Mill & Lumber Co., supra; Schmeltzer v. Scheid, 203 Ark. 274, 157 S.W.2d 193 (1941). The Arkansas case of Koonce v. Woods, 211 Ark. 440, 201 S.W.2d 748 (1947) in discussing the foregoing Arkansas statutes, said at 753:

" * * * payment of taxes on unimproved and unenclosed land under color of title for a period of seven consecutive years constitutes an investiture of title. Towson v. Denson, 74 Ark. 302, 86 S.W. 661, and other cases cited in Schmeltzer v. Scheid. By subsequent legislation (Act 199 of 1929, Pope's Digest, Sec. 8921) one who pays taxes on wild and unimproved land for a period of 15 years has color of title as a presumption of law. These statutes, of course, are not limitation measures. They establish, in the one case, an investiture of title, and in the other there attaches color of title as a legal presumption.

"A presumption of law, or a fact, or a condition, is just as binding on the State as on individuals; and the State, by acceptance of a taxpayer's money, as in the instant case, should be bound in a court of equity by analogous conditions which the lawmakers saw proper to declare as public policy. By this we do not mean that the State can be estopped by acts of its officials they were not authorized to consummate. On the contrary, the same principle heretofore promulgated is given effect, and it is this: After a long lapse of time a grant or conveyance by the State or its officials will be presumed—not as a matter of fact, but one of law."

For the reasons herein stated, the judgment is affirmed.