Barbara Susan **PAPISH**, Appellant,

v.

The **BOARD OF CURATORS OF** the **UNIVERSITY OF MISSOURI** et al., Appellees.

No. 71–1338.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1972.

Decided June 15, 1972.

Rehearing and Rehearing En Banc Denied Aug. 13, 1972.

Ross, Circuit Judge, dissented and filed opinion.

David N. Ellenhorn, New York City, Melvin L. Wulf, American Civil Liberties Union Foundation, New York City, Irving Achtenberg, Kansas City, Mo., for appellant.

Dennis J. Stewart, Jackson A. Wright, Marvin E. Wright, Columbia, Mo., for appellees.

Before VAN OOSTERHOUT, Senior Circuit Judge, and ROSS and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

This is a student "rights" case. It provides yet another example of the imaginative and extensive litigation in this area which seems to have as its purpose the attainment of plenary judicial oversight of the administration of tax-supported educational institutions.[1] In the

1. In recent years, the federal courts have been inundated with an avalanche of student lawsuits dealing with such issues as hair style regulations [see, e. g., Torvik v. Decorah Community Schools, 453 F.2d 779 (CA8 1972); Bishop v. Colaw, 450 F.2d 1069 (CA8 1971); and Freeman v. Flake, 448 F.2d 258 (CA10 1971)], campus demonstrations [see, e. g., Esteban v. Central Missouri State College, 415 F.2d 1077 (CA8 1969), certiorari denied 398 U. S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548, and Soglin v. Kauffman, 418 F.2d 163 (CA7 1969)], student publications [see,

present case, the issue arises in the context of a student dismissal, after service of written charges and after a full and fair hearing, for violation of a University rule of conduct.

## I

The facts are not in dispute. Barbara Susan Papish, then a 32-year-old graduate student [2] in the University of Missouri School of Journalism, Columbia campus, was, on June 6, 1969, dismissed from the University, effective March 26, 1969, on the ground that she violated paragraph B of Article V of the By-Laws of the University's Board of Curators. The Article reads, in pertinent part, as follows:

"Paragraph B: Students enrolling in the University assume an obligation and are expected by the University to conduct themselves in a manner compatible with the University's functions and missions as an educational institution. For that purpose students are required to observe generally accepted standards of conduct. Obstruction of University teaching, research, administration or other activities, *indecent conduct or speech*, failure to comply with requests of University officials in the performance of their duties and violations of the laws of the city, state or nation, are examples of conduct which would contravene this standard. (Emphasis supplied).

"This standard applies to all forms of student conduct and activity, and registration as a student constitutes full acceptance of the fundamental standard as well as other standards of conduct which may be adopted in implementation of this standard."

At the time of her dismissal, Miss Papish was on disciplinary [3] and academic [4] probation.

---

e. g., Norton v. Discipline Committee of East Tennessee State University, 419 F. 2d 195 (CA6 1969), certiorari denied 399 U.S. 906, 90 S.Ct. 2191, 26 L.Ed.2d 562, and Scoville v. Board of Education, 425 F.2d 10 (CA7 1970)], speaker bans [see, *e. g.*, Brooks v. Auburn University, 412 F.2d 1171 (CA5 1969)], recognition of student organizations [see, *e. g.*, American Civil Liberties Union of Virginia, Inc. v. Radford College, 315 F.Supp. 893 WD Va.1970)], access to the student paper [see, *e. g.*, Lee v. Board of Regents, 441 F.2d 1257 (CA7 1971)], and allegedly overbroad student conduct regulations [see, *e. g.*, French v. Bashful, 303 F.Supp. 1333 (ED La.1969), aff'd per curiam, 425 F.2d 182 (CA5 1970) and Barker v. Hardway, 283 F.Supp. 228 (SD W.Va. 1968), aff'd per curiam, 399 F.2d 638 (CA4 1968) certiorari denied 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217]. Additionally, this court recently dealt with a case in which a self-proclaimed homosexual was denied employment at a tax-supported University. McConnell v. Anderson, 451 F.2d 193 (CA8 1971), certiorari denied 405 U.S. 1046, 92 S.Ct. 1312, 31 L.Ed.2d 588 (1972). The forerunner of these cases is, of course, Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) a case from this circuit. For an exhaustive analysis of these and other cases, see principally, P. G. Haskell, Student Expression in the Public Schools, 59 Georgetown Law Journal 37 (1970) and P. G. Haskell, Judicial Review of School Discipline, 21 Case Western · Reserve Law Review 211 (1970).

2. Miss Papish's academic record reveals that she was in no rush to complete the requirements for her graduate degree in Journalism. She possesses a 1958 academic degree from the University of Connecticut; she was admitted to graduate school at the University of Missouri in September 1963; and although she attended school through the fall, winter, and summer semesters, she was, after 6 years of work, making little, if any, significant progress toward the achievement of her stated academic objective. At the time of her dismissal, Miss Papish was enrolled in a one-hour course entitled "Research Journalism" and in a three-hour course entitled "Ceramics 4." In the semester immediately preceding her dismissal, she was enrolled only in "Ceramics 3."

3. On November 1, 1967, the Faculty Committee on Student Conduct, after notice of charges and a hearing, placed Miss Papish on disciplinary probation for the remainder of her student status at the University. The basis for her probation was her violation of the general standard of student conduct embodied in Article V and set forth in the text. This action arose out of events which took place on October

The facts of significance may be summarized as follows. By letter under date of March 12, 1969 Miss Papish was given notice by the Dean of Students of the University that she was charged with

"violating on, or about February 18 and 19, at Columbia, Missouri, the General Standard of Student Conduct as set forth in Article V, Sections A and B of the By-Laws of the Board of Curators by failing to conduct yourself in a manner compatible with the University's functions and missions as an educational institution, in the following particulars:

"[t]hat while you were on a status of disciplinary probation you distributed or aided in the distribution of the Volume IV, No. 3, February 1969 edition of the *Free Press Underground* containing forms of indecent speech, on the campus of the University of Missouri—Columbia, with knowledge of the contents of the publication, and with knowledge that the Dean of Students had previously declared the forms of speech, therein appearing, indecent, and distribution thereof improper on the University campus under existing rules and regulations."[5]

From the verified affidavit of Miss Papish it is revealed that

"[she] is a member of the staff of the 'Free Press Underground', a newspaper published by the Columbia Free Press Corporation, a non-profit corporation organized under the laws of Missouri. The 'Free Press Underground', which has been published since 1965, disseminates news and opinion of general interest about University, local and world affairs. The paper generally is published monthly during the school year, and is distributed on the University campus and elsewhere. Written permission to distribute the paper on campus was obtained from the Business Officer of the University on April 30, 1967 in accordance with University regulations.[6]

"On February 16, 1969, I and a number of other students took part in the distribution of Volume IV, No. 3, February 1969 edition of the 'Free Press Underground' on the Columbia campus of the University, in front of the Memorial Union. Although no disrup-

14, 1967 at a time when the University was hosting high school seniors and their parents for the purpose of acquainting them with its educational programs and other aspects of campus life. She specifically was charged, *inter alia*, with openly distributing, on University grounds, without the permission of appropriate University personnel, two non-University publications of the Students for Democratic Society (SDS). It was alleged in the notice of charges, and apparently established at the ensuing hearing, that one of these publications, the *New Left Notes*, contained "pornographic, indecent and obscene words, 'f___,' 'bull s___,' and 'sh__s.'" The notice of charges also recites that the other publication, *The CIA at College: Into Twilight and Back*, contained "a pornographic and indecent picture depicting two rats apparently fornicating on its cover * * *."

4. Some two weeks prior to the incident causing her dismissal, Miss Papish was placed on academic probation because of prolonged submarginal academic progress. It was a condition of this probation that she pursue satisfactory work on her thesis, and that such work be evidenced by the completion and presentation of several completed chapters to her thesis advisor by the end of the semester. By letter dated January 31, 1969, Miss Papish was notified that her failure to comply with this special condition within the time specified would result in the termination of her candidacy for a graduate degree.

5. Section A of Article V reads as follows "The student body of the University of Missouri shall be comprised of all presently or hereinafter enrolled students. Such students are subject to classifications, as may be established from time to time by the President, or the Board of Curators, and shall be subject to such ordinances, rules, regulation and restrictions as may now be established or hereafter from time to time established by the President or the Board of Curators."

6. This contention regarding University approval is supported by stipulation of the parties.

tion of the University's functions occurred in connection with the distribution of the newspaper, I and three other students who were involved in its distribution were arrested, at the instigation of the University.[7]

"The February 1969 edition of the 'Free Press Underground' contained two features which the University later contended were 'indecent'. The front cover duplicated a political cartoon which appeared in the February 1969 edition of 'The Movement', a liberal paper of national circulation. The cartoon shows helmetted, clubwielding policemen raping the Statue of Liberty and the Goddess of Justice. The cartoon is captioned '. . . With Liberty and Justice for All.' *To me, the cartoon depicts and symbolizes the evils of authoritarian brutality.* As I said in an article in the 'Free Press Underground', 'Someone might consider the cartoon on the cover of this issue "vulgar". It is not! it is obscene. But it is a social comment concerning a greater obscenity. Chicago cops are obscene; nepalm is the greatest obscenity of the 20th century; and administrators who fear a different view are also obscene.' *The theme of the cartoon is purely political, and the University's act of labelling it 'indecent' can be viewed as political censorship.* (Emphasis supplied).

"The second feature of the issue which the University objected to was an article concerning the acquittal of a young New Yorker after a trial for assault and battery by means of a dangerous weapon. The article was reprinted from a political newspaper, the 'New Left Notes'. The article, which discussed the trial, the composi-

tion of the jury and similar matters, was headlined 'Motherf. . . . . Acquitted.' The subject of the article is Ben Morea, the leader of a group in New York's Lower East Side called 'Up Against the Wall, Motherf. . . . .', also known as 'The Motherf. . . . .s'. This group is an organization purportedly dedicated to the self-defense of the poor people from police and bureaucratic harassment. The headline, 'Motherf. . . . Acquitted', *was intended to describe Morea's organizational affiliation.* In that context, which should have been understood by our readers, the word 'Motherf. . . . .' has absolutely no sexual or indecent connotations." (Emphasis supplied).

On March 26, 1969 Miss Papish was afforded a hearing by the Student Conduct Committee on the charges stated in the March 12 letter. The Committee made the general finding that Miss Papish, in distributing the February 1969 edition of the *Free Press Underground,* violated the general standard of student conduct prescribed by paragraph B of Article V and decreed her dismissal effective that date. It appears from the Committee finding that Miss Papish's then existing disciplinary probation status was a factor in its decision. The decision was appealed first to the Chancellor of the University and then to the Board of Curators and affirmed in each instance. Because her dismissal was made effective as of March 26, Miss Papish was denied credit for a ceramics course which she successfully completed subsequent to that date, but it is to be noted that she also was able to avoid the otherwise damaging consequence of recordation of the grade of "F" with regard to the other course in which she was enrolled that term.[8]

---

7. The University specifically denies that it "instigated" the arrests of Miss Papish and her fellow workers.

8. Following the hearing before the Student Conduct Committee, Miss Papish obtained permission from the University Chancellor to attend classes pending review of the charges. For her post-hearing scholastic efforts, Miss Papish, but for her dismissal, would have received the grade of "B" in Ceramics and the grade of "F" in Research Journalism.

In August 1969 Miss Papish brought this action in the United States District Court for the Western District of Missouri against the University Board of Curators and against certain University officials. The complaint sought declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3), on the ground that Miss Papish's dismissal from the University was invalid under the First and Fourteenth Amendments. The District Court denied relief on the grounds (1) that Miss Papish "does not have a federally protected or other right to attend a state university of a state of which she is not a domiciled resident or citizen"[9] and (2) that "the conduct of plaintiff for which she was dismissed is not within First Amendment protections." Papish v. Board of Curators of the University of Missouri, 331 F.Supp. 1321, 1326 (1971). In this court, Miss Papish mounts an attack on these findings along three principal lines. *First,* she asserts that her dismissal is improper because it rests solely upon her exercise of freedoms which the first amendment guarantees. *Second,* it is argued that paragraph B of Article V of the by-laws of the University Board of Cu-

rators is invalid because it is impermissibly vague and because its language demonstrates a potential for sweeping improper applications posing a substantial likelihood of deterring important First Amendment freedoms. *Third,* the contention is made that Miss Papish's residence is irrelevant to her claim that University officials acted in violation of her constitutional rights. That being so, it is said that the District Court erred in its finding that Miss Papish was precluded from obtaining relief because, due to her Connecticut residency she did not possess a federally protected right to attend the University of Missouri.[10] For reasons soon to appear, we affirm the judgment of the District Court, but we do so on grounds which depart somewhat from the reasoning followed by the able and experienced District Judge (The Honorable William H. Becker, Chief Judge).[11]

## II

In the light of Miss Papish's academic difficulties, a cogent argument could be made to the effect that we must dismiss this case on the ground that it has now become moot.[12] As set forth

9. The District Court made the finding that Miss Papish was a resident of Connecticut at all times material to the events in litigation. In the view we take of the case, we deem it unnecessary to comment further on this fact and its relevance to Miss Papish's constitutional claims.

10. In addition to the foregoing claims, Miss Papish asserts that the District Court's decision was influenced, partially at least, by the principles and guidelines set forth in the Memorandum of Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education, 45 F.R.D. 133 (W.D.Mo.1968). An attack is then directed against the validity of the procedures by which these rules were adopted and, as well, against the substance of the rules therein set forth. We do not find record support for this contention. Accordingly, we express no view on this aspect of Miss Papish's appellate argument.

11. "In the review of judicial proceedings the rule is settled that, if the decision be-

low is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason." Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937). See Brown v. Allen, 344 U.S. 443, 459, 73 S.Ct. 397, 97 L.Ed. 469 (1953); J. E. Riley Investment Co. v. Commissioner of Internal Revenue, 311 U.S. 55, 59, 61 S.Ct. 95, 85 L.Ed. 36 (1940), and United States Gypsum Co. v. Greif Brothers Cooperage Corporation, 389 F.2d 252, 262 (CA8 1968).

12. The general doctrine of mootness remains as a significant judicial tool in dealing with cases in which subsequent events remove the need for adjudication. See, for example, Cole v. Richardson, 397 U.S. 238, 90 S.Ct. 1099, 25 L.Ed.2d 275 (1970), and Cole v. Richardson, 405 U.S. 676, 92 S.Ct. 1332, 31 L.Ed.2d 593 (1972). See also, Securities and Exchange Commission v. Medical Committee for Human Rights, 404 U.S. 403, 406, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972), and Roudebush v. Hartke, 405 U.S. 15, 18, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972).

above, Miss Papish was, effective January 31, 1969, placed on academic probation by reason of her failure to measure up to the superior academic standards required of those in pursuit of a graduate degree. Her future as a student in good standing was made to depend on improved academic performance and upon successful work towards the completion of her thesis. So far as we are able to determine from the record, neither condition has been fulfilled.[13] Furthermore, the Chancellor of the University has stated by affidavit that Miss Papish is no longer eligible academically to continue as a student in graduate school or to remain as a candidate for a Master's degree in Journalism.[14] Thus, even if we were persuaded that Miss Papish should prevail on the merits of her constitutional claims, it appears that she would not be re-admitted to the University for reasons which are quite distinct from the considerations which led to her dismissal. This being so, we must determine whether Miss Papish's failure to meet the terms and conditions of her academic probation has mooted the case.[15]

There is one factor in this case which weighs against a finding of mootness. We are told by the University that the events in issue attracted immediate public attention and publicity. Although we suspect that Miss Papish did little to keep this affair a private one, the fact remains that the incident received comment in the local press and that the University received hundreds of letters and telephone calls supportive of its stand. Because of the stigma which arose from this publicity and attached to her reputation, we believe that there is at least a colorable basis for finding that Miss Papish retains a significant stake in the outcome of this litigation. The same, we think, may be said for the University. Its legitimate interest in maintaining reasonable regulatory measures for the benefit of all students has been jeopardized and weakened by this lawsuit. It too deserves a definitive answer. For these reasons, we have concluded that the case is not moot.

### III

■ We reject the contentions that the rule of conduct pursuant to which Miss Papish's dismissal was accomplished is unconstitutional on its face.

Miss Papish first points to the discretion of University officials to discipline students whose conduct or speech they deem indecent. This part of the rule, she asserts, provides the University administrators authority to inhibit protected expression which the student fears "might" fall within its proscription. In effect, it is argued that because the rule fails to provide adequate notice as to what conduct or speech is permissible and what is not, and because it encourages arbitrary and erratic disciplinary action, it is unconstitutionally vague and must be excised. We are told that such unbridled discretion "is nothing less than an invitation to invidious censorship and cannot stand under the First and Fourteenth Amendments." This type of argument is not novel. It is not unlike that advanced in Esteban v. Central Missouri State College, n. 1, *supra*. We believe that this court's decision in that case controls disposition of these contentions here. There it was said that

"[There is] little basically or constitutionally wrong with flexibility and

---

13. The record contains an affidavit submitted by a professor of journalism at the University. The affidavit recites that Miss Papish was enrolled in, *inter alia*, a one-hour course in Research Journalism during the semester of her dismissal and that had she not been finally dismissed by the University effective March 26, 1969, she would have received the grade of "F" in that course. Appendix, at p. 43.

14. Appendix, at p. 52.

15. The "answer [to such a] question[s] is crucial, for it is well settled that federal courts may act only in the context of a justiciable case or controversy." Benton v. Maryland, 395 U.S. 784, 788, 89 S.Ct. 2056, 2059, 23 L.Ed.2d 707 (1969).

reasonable breadth, rather than meticulous specificity, in college regulations relating to conduct. Certainly these regulations are not to be compared with the criminal statute. They are codes of general conduct which those qualified and experienced in the field have characterized not as punishment but as part of the educational process itself and as preferably to be expressed in general rather than in specific terms." *Id.*, 415 F.2d at 1088. The rule of conduct attacked here is not ambiguous. It does, to be sure, invest University officials with some flexibility and discretion. But it does not, as Miss Papish would have us believe, invite invidious censorship. The standard contained in the rule restricts University administrators to disciplining expressive conduct in those situations where such a course is necessary to preserve and enhance the University's function and mission as an educational institution. Certainly the language of the rule, together with the governing standard embodied therein, can be easily understood by anyone who possesses the intelligence to gain admission to an accredited institution of higher learning. In our view, the Constitution requires no more.

It is said that even if the rule is not unconstitutionally vague, it is overly broad since, essentially, it is susceptible of application to speech or conduct that is protected by the First and Fourteenth Amendments. We disagree. Since Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), it has been recognized that

"[a]llowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances [that] [t]here are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem [that] [t]hese include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace [and that] [i]t has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.*, at pp. 571–572, 62 S.Ct. at 769 (Footnotes omitted).[16]

Viewed from the *Chaplinsky* perspective, the challenged provision of the rule at issue does not permit arbitrary or sweeping infringement of constitutionally protected interests in a degree not necessary to preserve an appropriate educational environment. It does not confer upon University administrators virtually unbridled and absolute power to suppress with impunity conduct or speech which they deem distasteful. Rather, the rule serves the narrow purpose of authorizing punishment only of those who engage in conduct or speech that detracts from the effectiveness of the educational process—conduct or speech that frustrates University pursuit of its function and mission as an institution of higher learning. It is this objective and definite standard by which the rule is to be applied that, for us, saves its validity in the face of an overbreadth attack. What the express language of the rule fails to articulate is necessarily capable of being supplied by the student tempted to call its validity into question. Compliance requires common sense and minimal respect for the

16. See Gooding, Warden v. Wilson, 405 U.S. 518, 522–528, 92 S.Ct. 1103, 1106–1109, 31 L.Ed.2d 408 (1972). *Gooding*, while recognizing the continuing vitality of the Chaplinsky doctrine, holds that when an overbreadth attack is levied against a *criminal* statute, courts will exercise a stricter scrutiny. See also Cohen v. California, 403 U.S. 15, 18–22, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) and United States v. O'Brien, 391 U.S. 367, 376, 382, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

lawful rights of others, not legal accumen.

On this record it sufficiently appears that the rule furthers the legitimate University interest in providing the order and discipline essential to fostering an effective learning process and that its restriction on constitutional freedoms is no greater than is essential to the furtherance of that interest.

## IV

■ We are not persuaded by Miss Papish's contention that even if the rule of conduct under which she was disciplined is not void on its face, it has been unconstitutionally applied in this instance.

As noted above, the parties concede that it was the attempted sale [17] of the *Free Press Underground* that produced the disciplinary action to which Miss Papish now excepts. She argues that the newspaper sold and distributed by her does not lose its First Amendment protection simply because it contained indecent speech, and, in any event, she denies the newspaper contains material which can be labeled "legally obscene." She asserts that such publications as the one she attempted to sell at the crossroads of the campus "create an educationally stimulating atmosphere, promote critical thought, and encourage debate." Finally, she informs us that the University bookstores permit the sale of nationally popular publications which contain erotic and vulgar passages.

This latter point, we assume, is to suggest that the apparent inconsistency of dismissing her for sale of the *Free Press Underground* and inviting the reading of other allegedly similar literature is so unfair and unreasonable as to constitute constitutionally cognizable harm.[18]

Miss Papish's arguments with regard to unconstitutional application readily reduce themselves to a contention that she had a right to express a controversial and unpopular point of view, free from University regulation and interference. With that contention we partially agree.

But there is no evidence in this record to indicate that the University so applied its rule of conduct as to penalize Miss Papish for advocacy of her ideas. Nor does the record evidence reveal that she unsuccessfully sought permission to sell her publication in the University bookstores.[19] What the record does reflect is an application of the rule to discipline Miss Papish for the manner in which she sought to exercise her rights. Given the absence of record evidence to indicate that the University sought, in any manner, to restrict the substantive message the *Free Press Underground* conveyed, we do not believe that Miss Papish has sustained First Amendment harm. The University could and did rightfully regulate the means by which she sought to espouse her views, but it did so without effectively repressing her ability to advocate the causes to which

17. The record does not clearly reveal whether the newspaper was being "sold" or whether Miss Papish was distributing it free of charge. We note, however, that the newspaper cover recites a sales price of $.15, and that the Dean of Students testified to his purchase of several copies.

18. Compare, as to this aspect of Miss Papish's argument, Keefe v. Geanakos, 418 F.2d 359, 362 (CA 1 1969), and Vought v. Van Buren Public Schools, 306 F.Supp. 1388, 1394–1396 (ED Mich. 1969). We reject the import of such an argument. The mere fact that the University permits the sale of certain material in its bookstore does not, without more, inevitably lead to the conclusion that every University student should be free to distribute such material, as he sees fit, in other areas of the campus. We believe that the University has inherent authority to impose reasonable restrictions as to time, place and manner of sale or distribution.

19. Indeed, the parties have stipulated that the University had granted permission to the *Free Press Underground* to sell its publication on campus. That being so, there is little basis upon which to conclude that the University would entirely close the door to campus distribution.

she professed such profound dedication. We know of no constitutional prohibition precluding that course of University regulatory action.[20]

We express no view as to whether the *Free Press Underground* contained materials which can be adjudged obscene *per se* under contemporary legal standards. Nor do we think that consideration to be particularly relevant to disposition of the narrow issue before us. We are aware that free expression plays a vital role in the democratic process. But no provision of the Constitution requires the imposition of so high a value on freedom of expression that it can never be subordinated to other interests such as, for example, the conventions of decency in the use and display of language and pictures on a University campus. The Constitution does not compel the University to promote the vernacular of the gutter by allowing such publications as the one in litigation to be publicly sold or distributed on its open campus, and this court will not now propound such a rule. Whether such publications must be made available in its bookstores is an issue not properly before us.

The notion that federal courts should not cavalierly interfere in the internal affairs of this Nations' colleges and universities has found expression in earlier decisions of this court. McConnell v. Anderson, n. 1, *supra. McConnell* accordingly held that we will not overturn the action of University administrators in the absence of an affirmative showing that it was premised upon an arbitrary, unreasonable or capricious determination. From what we have said it is clear that the University action in this case cannot fairly be described as arbitrary, unreasonable or capricious. In point of fact, this is one of those cases, not at all unfamiliar in student-school litigation, where disciplinary action resulting from crass and absurd conduct is

sought to be made redressable by characterizing the underlying factual events in constitutional terms. We hold that the First Amendment does not invalidate the University's dismissal of Miss Papish, and that Chief Judge Becker was quite correct in finding that the University was entitled to judgment.

Affirmed.

ROSS, Circuit Judge (dissenting).

I respectfully dissent. It is clear that Miss Papish was dismissed from the University because of a finding that the cartoon, depicting helmeted, club-wielding policemen raping the Statue of Liberty and the Goddess of Justice, and the headline, "Motherfucker Acquitted", were obscene. This objectionable material appeared in the *Free Press Underground*, a publication which had been distributed on campus, with the University's permission, for almost two years. The distribution of this particular edition, by Miss Papish, however, was found to be in violation of the Board of Curator's by-law proscribing "indecent conduct or speech." The dismissal could not have been on the basis of physical disturbance or disr ption resulting from the distribution, ' ause it was admitted, by stipulation, that there had been none. Rather, the record amply demonstrates that Miss Papish was disciplined for the content of the newspaper, rather than merely its distribution.

The trial court found that the cartoon and the headline were obscene, were "pandered" by Miss Papish, and were therefore not protected by the first and fourteenth amendments. In this Court, the Board of Curators argue that the cartoon, appearing on the cover of the newspaper, and the headline, appearing on the second page, taken together, supply the erotic connotations necessary to be considered legally obscene under the *Roth* standard. *See* Roth v. United States, 354 U.S. 476, 489, 77 S.Ct. 1304,

20. Cf. Cohen v. California, supra, pp. 18–19 of 403 U.S., 91 S.Ct. 1770. See also Norton v. Discipline Committee of East Tennessee State University, n. 1, *supra*; Hatter v. Los Angeles City High School District, 310 F.Supp. 1309 (CD Calif. 1970), and Baker v. Downey City Board of Education, 307 F.Supp. 517 (CD Calif. 1969).

1 L.Ed.2d 1498 (1957). It is clear to me that the cartoon and the headline, alone or together, cannot be characterized as legally obscene.

The cartoon, a hard-biting social comment, may be revolting to most persons, but it certainly cannot be considered obscene under the standards enunciated by the Supreme court. As stated in an affidavit submitted by an associate professor of art at the University, "[t]he cartoon in question is a biting satirical depiction of the artist's view of police brutality and injustice. The obvious theme is a political protest against police injustice and police interference with liberty."

Likewise, the word "motherfucker", common in the modern radical genre,[1] and used as it was in the news story in question, does not conjure up erotic thoughts of incestuous conduct. Cf. Cohen v. California, 403 U.S. 15, 20, 91 S. Ct. 1780, 29 L.Ed.2d 284 (1971). In Cohen, the Supreme Court held that the words "Fuck the Draft" written upon a jacket, and publicly displayed in a state courthouse in front of women and children, was a protected exercise of the "freedom of speech" guaranteed by the Constitution. The Court held that not only was that expression not legally obscene, but also that the State of California had no overriding justifiable interest in regulating it as "offensive conduct." Certainly a word, such as was used in the Free Press Underground, comes as no great shock to the majority of today's youth; and the University cannot validly be said to have an overriding justifiable interest in protecting college-age students from exposure to it. Cf. Keefe v. Geanakos, 418 F.2d 359, 361 (1st Cir. 1969).

There is no doubt an educational institution has authority to prohibit legally obscene material from its campus, because that material retains no constitu-tional protection. It likewise has authority to regulate dissemination of forms of speech or conduct that is something less than obscene, if that action is calculated to or has the potential effect of being disruptive to the educational process. In such a case, it is the act of dissemination, and the resulting disruption, rather than solely the content of the material disseminated, which is offensive. For a regulation prohibiting such conduct to be constitutionally valid, the student's interests of free expression must be outweighed by the University's interest in protecting its educational process. See Scoville v. Board of Education, 425 F.2d 10, 14 (7th Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed. 2d 55 (1970). Moreover, "the standard of conduct which a college seeks to impose must be one relevant to 'a lawful mission, process or function of the educational institution' . . . ." Esteban v. Central Missouri State College, 415 F.2d 1077, 1088 (8th Cir. 1969). In the absence of constitutionally valid reasons to regulate speech or conduct, students are entitled to freedom of expression of their views. Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 511, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

"Obviously, one does not lose his first amendment rights by matriculation at a college. Those rights follow one through the classroom door . . . . And what better or more ideal place is there for free discussion and for the exchange of ideas than academic halls?" Esteban v. Central Missouri State College, supra, 415 F. 2d at 1085.

It is argued that the fact Miss Papish was distributing "indecent" material on the sidewalks of the campus distinguishes this case from other methods of distribution or exchange of ideas. However, upon the facts of this case, this ar-

1. See Lifton, "The Young and the Old", Atlantic Monthly (Sep. 1969), for the etymology of the word. This article was introduced by plaintiff as evidence of the type of literature, containing the same word, that was being sold in the campus book store. The same article was also the subject of the litigation in Keefe v. Geanakos, 418 F.2d 359 (1st Cir. 1969).

gument disregards the premise that the touchstone is disruption or interference with the legitimate educational processes of the University. There must have been more than "mere fear and apprehension of possible disturbance." Esteban·v. Central Missouri State College, *supra*, 415 F.2d at 1087; *see* Tinker v. Des Moines Independent Community School Dist., 393 U.S. at 514, 89 S.Ct. 733. Yet, from the record in this case, it cannot be said that the requisite disruption was imminent.

While I wholeheartedly agree that a school has latitude and discretion in formulating its regulation of general standards of conduct, Esteban v. Central Missouri State College, *supra*, 415 F.2d at 1088, in a case where a student's constitutional rights are being infringed, those rules and regulations must be related to the legitimate interests of protecting its educational process. By dismissing Miss Papish for the reasons it gave, without a showing of disruption to that process, the University violated her rights of free expression guaranteed by the first and fourteenth amendments. I would, therefore, reverse the district court, and order Miss Papish reinstated unless she is barred from reinstatement for valid academic reasons.