**Carmen Gloria MARIN, on behalf of Javier Melendez and Ramon Bosque Lugo on behalf of Ramon Bosque Perez, Plaintiffs,**

v.

**UNIVERSITY OF PUERTO RICO et al., Defendants.**

**Civ. No. 137–72.**

United States District Court, D. Puerto Rico.

July 18, 1973.

Opinion on Rehearing Sept. 24, 1974.

Opinion on Post Judgment Motion Jan. 30, 1974.

---

9. Most courts have recognized that the number of hours is not determinative. Greenwell v. United States, 119 U.S.App.D.C. 43,

336 F.2d 962, 966 (1964). It should be noted, though, that 18 U.S.C. § 3501(c) would sanction a six hour delay.

Pedro J. Varela, Legal Services, Inc., Rio Piedras, P. R., for plaintiffs.

M. Martinez Umpierre, Arecibo, P. R., Alberto Pico, San Juan, P. R., for defendants.

Before COFFIN, Circuit Judge, CANCIO and TOLEDO, District Judges.

OPINION

TOLEDO, District Judge.

This is a three-judge court action filed on February 4, 1972, on behalf of two students [1] of the Arecibo Regional College of the University of Puerto Rico (hereinafter called the Arecibo Regional College), under Section 1981 et seq. of the Civil Rights Act, Title 42, United States Code and under Title 28, United States Code, Section 2281, seeking injunctive and declaratory relief. Plaintiffs pray that we enjoin the University of Puerto Rico and its officials from applying several provisions of the "General Rules and Regulations for the Students of the University of Puerto Rico" (hereinafter called General Rules and Regulations, reproduced in an Appendix hereto), which regulate the conduct of all students in the dependencies of said University.[2]

Plaintiffs, full time students of the Arecibo Regional College, were suspended for more than one year by the Dean and Director of the Regional College for violating various provisions of the General Rules and Regulations. They claim

1. Carmen Gloria Marín filed this action on behalf of her grandson Javier Meléndez Domínguez, since his mother, who has custody of him through a divorce decree, resided at the time of the filing, in Montgomery, Alabama. During preliminary proceedings plaintiffs' attorneys filed a verified motion stating that Javier Meléndez' mother was at that time in Puerto Rico and had consented to file the suit and represent her son in the same. Accordingly, plaintiffs' attorneys moved to amend the complaint to substitute Milagros Domínguez as plaintiff on behalf of her son. Plaintiff Ramón Bosque Pérez was also permitted to be represented by Ramón Bosque Lugo, his father. Motion granted.

2. The University of Puerto Rico consists of four major campuses; two in Rio Piedras, one in Mayaguez and one in Cayey, and five regional colleges in Bayamón, Humacao, Arecibo, Ponce and Aguadilla.

that certain provisions of the General Rules and Regulations are, on their face, and as applied to them, unconstitutional since they, assertedly, violate the First, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America by directly violating or imposing prior restraints, or infringing upon plaintiffs' rights to freedom of speech, association, peaceful assembly, petition the government for the redress of grievances, due process and equal protection of the laws. Plaintiffs further allege that several of the involved sections of the General Rules and Regulations are vague and overbroad and constitute an impairment of constitutionally protected conduct.

## PROCEDURAL BACKGROUND OF JURISDICTIONAL MATTERS

The defendants moved to dismiss the complaint on various procedural and substantive grounds. The author of this opinion, sitting as a single district judge, entered on May 24, 1972, a Memorandum Opinion, Marín v. University of Puerto Rico (D.C.P.R.1972), 346 F. Supp. 470, denying the motion to dismiss, and also convening the three-judge court, as prayed in the complaint.[3]

Defendants have raised jurisdictional and pseudo-jurisdictional arguments before the entire panel at the hearing held on July 25, 1972. The Court adopts the Memorandum Opinion of May 24, 1972, as its opinion on the jurisdictional and pseudo-jurisdictional aspects.

After arguments on the merits of the cause were heard and the case was under submission, defendants moved to dismiss for lack of jurisdiction under Title 42, United States Code, Section 1983, relying on the recent decision of District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). The Court finds the motion without merit. It suffices to say that in *Carter* the Supreme Court simply held that the District of Columbia was neither a state nor a territory within the meaning of Section 1983, pointing out the unique ability of Congress to observe and supervise the activities of local officials at the seat of the national government. The Court therein carefully distinguished the District of Columbia as being *sui generis* "[u]nlike either the States or Territories", 409 U.S. at 432, 93 S.Ct. at 610. It is clear to this Court that the rationale of affording a federal right in federal courts where local and distant officials might deny citizens their constitutional rights is as fully applicable to the Commonwealth of Puerto Rico as it is to the states of Virginia or California or to the Virgin Islands.

## FACTUAL BACKGROUND

The activities of plaintiffs at the Arecibo Regional College in late 1971 led to three groups of charges, a hearing before the student-faculty Disciplinary Board, and their suspension for the calendar year 1972.

The first group arose from an incident occurring on November 16, 1971 when plaintiff Javier Meléndez, accompanied by plaintiff Ramon Bosque, en-

3. In Marín v. University of Puerto Rico, supra, the Court determined that the challenged regulations, though confined to one institution were of statewide applicability; that the complaint presented a substantial constitutional claim; that neither exhaustion of administrative remedies nor abstention was required or appropriate, as well as that the case was ripe for adjudication. Likewise, the Court therein issued a requested temporary restraining order, preventing the defendants, their successors in office, officials, agents, and employees and all other persons in concert and participation with them from refusing to allow the plaintiffs to register as students of the Arecibo Regional College of the University of Puerto Rico during the summer or regular session and from refusing to allow plaintiffs to complete the academic work of the then current semester, pending a hearing and determination of the case by the statutory three-judge court therein being convened. In pretrial proceedings prior to said Memorandum Opinion the Court dismissed the action against the Council of Higher Education of the University of Puerto Rico upon agreement of the parties.

tered the college library at noon and briefly addressed other students opposing the administration's conduct of a campus election and announcing his withdrawal as a candidate for the presidency of the Student Council. The following day both plaintiffs were summarily suspended until December 7, 1971, under Article 16 of the Regulations, for violations of Article 10A(1), (4), (6), (7) and Article 3C(2)(a). On December 3, this suspension was extended to February 4, 1972, because of plaintiffs having entered a conference room on December 2, 1971, where the dean of the college was meeting with members of the Student Council. Plaintiffs twice refused to leave the meeting on request of the dean but later left when the President of the Council explained the nature of the meeting. The extension of summary suspension was based on charges of violations of Article 10A(1), (4), and (6).

The second group of charges arose out of plaintiff Bosque's actions on November 29 and 30 in distributing leaflets to students and denouncing the election proceedings through a loudspeaker at the place of balloting. He was charged with violations of Article 10A(1), (4), (6), and (7). These charges, though not formally filed until December 17, were, however, also relied on in extending plaintiff Bosque's initial suspension.

Finally, on December 23, charges were filed against both plaintiffs for picketing the Administration Building on December 8, protesting their summary suspension. The picketing was non-violent and was held at lunch time in the street. Plaintiff Ramon Bosque used a loudspeaker, urging students to join the picket, and on one occasion used an epithet in referring to the Associate Dean. Both plaintiffs were charged with violations of Article 3C(2)(a) and (b) and Article 10A(1), (6), and (7). Plaintiff Bosque was also charged with a violation of Article 10A(4).

A full hearing, with counsel participating, was held by the Disciplinary Board on January 15, 1972, resulting in a report on January 18. The Board dismissed the first group of charges against plaintiff Ramon Bosque for the library incident, but found proven those against Javier Melendez, as it did the charges against both stemming from the conference room incident of December 2, 1971. As to the second group, plaintiff Ramon Bosque was found to have violated Article 10A(1), in taking part in a university activity, i. e., the election, while under suspension. All charges in the third group were found to have been proven. The dean, acting on these findings on January 21, 1972, thereupon suspended plaintiffs until December 31, 1972.

While this opinion was in preparation, the Court received a motion by the defendants to dismiss the action as moot on the ground that the suspensions were only to remain in force until December 31, 1972, and that they had expired by their own terms on that date. Even assuming that this means the defendants will not impose the suspension even if they are successful here, this contention is without merit. First, there exist possible collateral effects of the suspensions—both the stigma directly suffered and the consequences of the entry of the suspensions on the students' records. See Jones v. Snead, 431 F.2d 1115 (8th Cir. 1970); Esteban v. Central Missouri State College, 415 F.2d 1077 (8th Cir. 1969), cert. denied, 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970) (decisions which rely on the holding of the United States Supreme Court in Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968)). See also Graham v. Knutzen, 351 F.Supp. 642 (D.Neb.1972). Second, the challenge by politically active students to regulations of the nature of those here involved is bound to be a matter of recurring controversy. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); Oil Workers Union v. Missouri, 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373

(1960). For these reasons it also makes no difference that, as defendants' motion informs us, one of the plaintiffs has moved to another campus of the University.

## CONSTITUTIONAL CONSIDERATIONS

### A. *Preliminary Statement*

No one can doubt that today students in institutions of higher education throughout the world are increasingly participating both in the political affairs of their societies and in the determination of the policies of their institutions. Many students have deep-felt views regarding the need for extensive restructuring of our society. This has produced massive student dissent, which has been manifested in street rallies and demonstrations as well as in participation in the normal elective and political processes.[4]

Students have taken their views of the problems in society to the institutions which they attend. There, too, extensive ferment has resulted, as students have pressed to assert and vindicate their rights to participate in the institution governing them. In Puerto Rico, students of the University have long requested full and adequate participation in the determination of the policies of that institution. After an arduous process, encompassing much unrest and turmoil,[5] they have obtained, effective as of the next academic year (1973–74), representation in most of the policy-making organisms of the University.[6]

These rights have been obtained only through the extensive exercise of the rights conferred on them through the First Amendment of the Constitution of the United States of America. Their exercise of these rights has led to a plethora of case law [7] and to a substantial literature [8] on the subject of students'

4. To Establish Justice, To Insure Domestic Tranquility, The Final Report of the National Commission on the Causes and Prevention of Violence, IX, Page 177 (1970).

5. See Special Report on Academic Freedom at the University of Puerto Rico, Civil Rights Commission of the Commonwealth of Puerto Rico, March 15, 1967. This special report offers some elaboration on events of turmoil and unrest, caused by this quest of the students, that had occurred at the University of Puerto Rico up to that date. Many more events, have transpired after such dates, some dealing with students' requests for participation, others with students' views of the purpose and essence of the University and its response to society.

6. Certification Number 45 of the Council of Higher Education of the University of Puerto Rico dated November 21, 1972.

7. The extensive number of cases on the subject makes it inappropriate to list them; but see cases commented on the legal literature on this subject. See footnote 8. See also Papish v. Board of Curators of University of Missouri (8th Cir. 1972), 464 F.2d 136, n. 1, rev'd., 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973).

8. See among others: Note, Students' Constitutional Rights on Public Campuses, 58 Va. L.Rev. 552 (1972); Carrington, Civilizing University Discipline, 69 Mich.L.Rev. 393 (1971); Note, Bringing the Vagueness Doctrine on Campus, 80 Yale L.J. 1261 (1971); Note, The Constitutional Standards for the Content of College Disciplinary Regulations, 1971 U. of Ill.L.J. 256; Note, Suspension of Student Pending Disciplinary Hearing, 2 Tex.Tech.L.Rev. 271 (1971); Note Vagueness and Overbreadth in University Regulations, 2 Tex.Tech.L.Rev. 255 (1971); Due Process in the Student Institutional Relationship, American Association of State College and Universities (1970); Note, Colleges and Universities—Constitutional Law—Legality of Broad Rules Governing Student Behavior, 48 N.C.L.Rev. 943 (1970); Note, *Constitutional Law: Students Rights*—Dismissal and Due Process, 38 Tenn.L.Rev. 112 (1970); Note, The Emerging Law of Student Rights, 23 Ark.L.Rev. 619 (1970); Report of the American Bar Association on Campus Government and Student Dissent (1970); Schwartz, The Student, the University and the First Amendment, 31 Ohio S.L. J. 635 (1970); Comments, Fourteenth Amendment & University Disciplinary Procedures, 34 Mo.L.Rev. (1969); Wright, The Constitution on Campus, 22 Vand.L.Rev. 1027 (1969); Note, Developments in the Law, Academic Freedom, 81 Harv.L.Rev. 1045 (1968); Note, Uncertainty in College Disciplinary Regulations, 29 Ohio State L.F. 1023 (1968); Van Alstyne, The Judicial Trend Toward Student Academic Freedom, 20 U.Fla.L.Rev. 230 (1968); Van Alstyne,

rights within the campus. This case forces us to confront some of the issues relating to the scope and limitation of those rights.

B. *Issues Raised*

Plaintiffs broadly challenge Articles 3C(2)(a) and (b) and Article 10A(4), (6), and (7), as violative of their rights of free expression and due process. Specifically, they attack Article 3C(2)(a) and Article 10A(7), as impermissible prior restraints on their rights of free speech and association and their right to petition for the redress of grievances. They also argue that Article 3C(2)(b) and Article 10A(4) and (6) are impermissibly vague and overbroad. Finally, they assert that Article 16, giving university officials broad authority to suspend summarily, is infirm because of inadequate procedural due process.[9] This last being an extensive challenge and one directed at the procedures which commenced this controversy we address it first in our discussion of the merits.

C. *General Background to Consideration of Issues*

The law applicable to students' rights in public educational institutions has developed at a rapid pace in recent years. See footnotes 7 and 8, supra. From this development basic principles have emerged which we deem proper to enunciate before entering into the merits of plaintiffs' contentions.

It is well settled that the regulation of student conduct is ordinarily the prerogative of the educational institution. Sword v. Fox, 446 F.2d 1091, 1096 (4th Cir. 1971), rev'ing 317 F. Supp. 1055 (W.D.Va.1970). In prescribing generally conduct within the institution, school authorities have wide discretion. Quarterman v. Byrd, 453 F. 2d 54, 57 (4th Cir. 1971); Esteban v. Central Missouri State College, 415 F.2d 1077, 1080 (8th Cir. 1969), cert. denied, 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970); Sill v. Pennsylvania State University, 318 F.Supp. 608 (M.D.Pa. 1970), aff'd, 462 F.2d 463 (3d Cir. 1972). It is also well settled that it is not the policy of the federal courts "[to] intervene in the resolution of conflicts which arise in the daily operation of school systems." Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). But it is equally clear that this "comprehensive authority" must be exercised "consistent with fundamental constitutional safeguards." Healy v. James, 408 U.S. 169, 180, 92 S. Ct. 2338, 2345, 33 L.Ed.2d 266 (1972). A student loses none of his constitutional rights by virtue of his status as a student—"State colleges and universities are not enclaves immune from the sweep of the First Amendment." Id. at 180. Tinker v. Des Moines Independent School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Papish, supra. Indeed, the vigilant protection of constitutional freedom is nowhere more

The Student as a University Resident, 45 Denver L.J. 582 (1968); Wilson, Campus Freedom and Order, 45 Denver L.J. 502 (1968); General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education, 45 F.R.D. 133 (D.C.Mo.1968); Joint Statement on Rights and Freedoms of Students, 53 A.A. U.P.Bull. 365 (1967); Special Report on Academic Freedom at the University of Puerto Rico. Civil Rights Commission of the Commonwealth of Puerto Rico, March 15, 1969; Sherry, Governance of University Rules, Rights and Reponsibilities, 54 Calif. L.Rev. 27 (1966); Van Alstyne, Student Academic Freedom and the Rule—Making Powers of Public Universities: Some Constitutional Considerations, 2 Law in Transition Quarterly 1 (1965); Academic Freedom and Civil Liberties of Students in Colleges and Universities, American Civil Liberties Union, 1965 (Rev.ed.); Johnson, The Constitutional Rights of College Students, 42 Tex.L.Rev. 344 (1964).

9. While the complaint challenges several other provisions, specifically Article 3B, 3C(2)(h), Article 4A and Article 10A(5), we need not pass on those challenges, none of those regulations having been invoked against these plaintiffs at any point in the suspension proceedings.

vital than in the academic community. *Epperson,* supra; Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); for "[t]he college classroom with its surrounding environs is peculiarly the 'market place of ideas' ". *Healy, supra,* 408 U.S. at 180, 92 S.Ct. at 2346. In short, a delicate balance must be achieved between the authority of the university to regulate student conduct disruptive of its activities or intrusive on other's rights and the constitutional rights of the students.

D. *Merits*

1. Challenge to Article 16 of the General Rules and Regulations. The challenge to Article 16 is twofold. Plaintiffs first allege that the authority given the Chancellor or Director to "summarily suspend for a reasonable period" violates due process in giving excessive discretion to suspend without prior notice or hearing. They also contend that the Article suffers from vagueness and overbreadth, violating plaintiffs' rights of free speech and assembly. Plaintiffs contend as well that their suspension constituted a cruel and unusual punishment. Defendants' position is limited to the assertion that plaintiffs no longer have standing to attack their summary suspension because it expired and merged in the final award of the Disciplinary Board and that, therefore, the issue is moot. We must reject this contention both for the two reasons already given for rejecting the argument of mootness as to the entire case—collateral effects and recurring controversy—and because the summary suspension was noted in some of the later charges and indeed was the only basis for finding plaintiff Bosque's participation in the election to be a violation of the regulations.

In considering the merits of plaintiffs' due process arguments, we must first determine whether due process protections apply to suspension of students by public educational institutions. The relevant inquiry is whether plaintiffs' interests affected here are within the concepts of "liberty" or "property" protected by the due process clause. Board of Regents v. Roth, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). That interest has been described in the seminal case as "the right to remain at a public institution of higher learning in which the plaintiffs [are] students in good standing." Dixon v. Alabama State Board of Education, 294 F.2d 150, 157 (5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961). The enormous importance of education has been repeatedly reaffirmed.[10] See Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 29, 93 S.Ct. 1278, 1295, 36 L.Ed.2d 16 (1973), and cases cited therein. "It is a principal instrument in awakening the [individual] to cultural values [and] in preparing him for later professional training", *Brown,* 347 U.S. at 493, 74 S.Ct. at 691. As the Court has recently stated, the term liberty includes "the right . . . to engage in any of the common occupations of life, to acquire useful knowledge . . . and generally to enjoy those privileges

10. Puerto Rico's assessment of the significance of education can readily be ascertained from its budgetary allocations. The instruction and culture sector of the social development program part of the budget, which sector is comprised of the Department of Public Instruction, the University of Puerto Rico, the State Board of Education, Institute of Puerto Rican Culture, and the Festival Casals, Inc., was assigned the sum of $520.8 million out of a total budget for the current fiscal year (1972–73) of $1,543.5 million, or 33.7%. Model Budget for the year 1974 (Prepared by the Bureau of the Budget of Puerto Rico, Office of the Governor of Puerto Rico, Commonwealth of Puerto Rico). Of that allocation, the University of Puerto Rico alone was granted $105.9 million. For the fiscal year 1974, it has been recommended that $534.9 million of a total budget of $1,570.4 million, or 34% be allocated to the sector, of which $116.0 million has been recommended for the University. Id.

long recognized . . . as essential to the orderly pursuit of happiness by free men." *Roth,* supra, 408 U.S. at 572, 92 S.Ct. at 2707. The right to engage in a chosen occupation is meaningless if one is unable to obtain the training it requires; similarly, the right to acquire useful knowledge implies a right of access to institutions dispensing such knowledge. It is too late in the day, now that the right-privilege distinction is dead and buried, Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Roth,* supra, 408 U.S. at 571, 92 S.Ct. 2701, to argue that the right to attend a public educational institution to which one is admitted or attending as a student in good standing is not within the "liberty" protected by the due process clause. See *Dixon,* supra; Farrell v. Joel, 437 F.2d 160, 162 (2d Cir. 1971); Tate v. Board of Education of Jonesboro, 453 F.2d 975, 979 (8th Cir. 1972); Linwood v. Board of Education of Peoria, 463 F.2d 763, 770 (7th Cir. 1972).

Due process protection is particularly necessary when, as here, the governmental action may damage the individual's standing in the community, academic or general, or may impose "a stigma or other disability that foreclose[s] his freedom to take advantage" of other educational or future employment opportunities. *Roth,* supra, 408 U.S. at 573, 92 S.Ct. at 2707. Suspension from a public college is a mark on one's record that may well preclude further study at any public and many private institutions and limit the positions one can qualify for after termination of one's studies. For all of these reasons, we hold that the due process clause applies to educational suspensions.[11]

The more difficult question is what procedural protection is due. *Goldberg*; *Fuentes.* What standards of due process an educational institution must follow before it suspends any of its students has been the subject of some comment[12] and jurisprudential attention.[13] The standards depend on

11. While the Court in *Rodriquez,* supra, held that education is not a fundamental right requiring strict equal protection scrutiny, because not a right directly guaranteed by the Constitution, implicitly or explicitly, 411 U.S. at 29, 93 S.Ct. 1278, that question is not determinative of the issue here. As the Court has repeatedly made clear, a private interest need not be of constitutional origin to be worthy of procedural protection. In Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Court applied procedural protections to the deprivation of statutory financial assistance benefits. In Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the Court held an installment purchaser's possessory interest in consumer goods to be within the clause's meaning of "property". In Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Court ruled that a teacher's legitimate claim of entitlement to job tenure would be sufficient to come under the due process umbrella. Indeed, in *Roth,* the Court explicitly stated that the property interests protected by the Constitution are created and defined by "an independent source such as state law". 408 U.S. at 564, 92 S.Ct. at 2703. We deem it significant that in listing public benefits the denial of which requires due process protection, the Court in *Goldberg* cited *Dixon,* supra, with a caption reference to the "right to attend a public college". 397 U.S. at 262 n. 9, 90 S.Ct. at 1018.

12. Note, Student's Constitutional Rights on Public Campuses, 58 Va.L.Rev. 552, 559 (1972); Note, Suspension of Student Pending Disciplinary Hearing, 2 Texas Tech.L.Rev. 255, 271 (1971); Note, Due Process in Secondary Schools, 54 Marquette L.Rev. 358, 359 (1971); Wright, The Constitution on Campus, 22 Vand.L.Rev. 1027, 1074 (1969).

13. For cases dealing with summary suspensions from a college or university, see, e. g., Stricklin v. Regents of University of Wisconsin, 297 F.Supp. 416 (D.C.Wisc.1969), app. dism. as moot, 420 F.2d 1257 (7 Cir. 1970) (suspension of 13 days); Gardenhire v. Chalmers, 326 F.Supp. 1200 (D.C.Kansas 1971) (indefinite suspension).

Examples of similar suspensions within the public school context are found among others in: Tillman v. Dade County School Board, 237 F.Supp. 927 (D.C.Fla.1971) (10 days suspension); Black Students of North Fort Myers Jr.–Sr. High School v. Williams, 335 F.Supp. 820 (D.C.Fla.1972), aff'd, 470 F.2d 957 (5 Cir. 1972) (10 days suspension); De Jesus v. Penberthy, 344 F.Supp. 70 (D.C.Conn.1972) (suspended for a period

the nature of the interests affected and the circumstances of the deprivation. *Morrissey,* supra, 408 U.S. at 481, 92 S. Ct. 2593; Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Goldberg,* supra, 397 U.S. at 263, 90 S.Ct. 1011; Cafeteria and Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). The students' general interest has been articulated above. It includes specifically the opportunity to attend class, consult faculty, utilize university facilities, participate in extra-curricular activities, and generally partake in the academic community. The state's interests are important and numerous: protection of life, limb, and property (both public and private), preservation of order guaranteeing the educational opportunities of others, and, in circumstances not present here, vindication of the integrity of the academic process. But no sound reason appears why, in light of the individual's significant interest, these state goals, however important, need be vindicated in the normal case without (1) adequate advance notice to the student of (a) the charges, (b) the specific, previously promulgated regulations under which the charges are brought, and (c) the evidence against the student; (2) a full, expedited evidentiary hearing (a) presided over by an impartial, previously uninvolved official, (b) the proceedings of which are transcribed, at which the student (c) can present evidence and (d) cross-examine opposing witnesses, (e) with the assistance of retained counsel; and (3) a written decision by the presiding official encompassing (a) findings of fact, (b) the substantial evidence on which the findings rest, and (c) reasons for the conclusion. See *Morrissey,* supra, 408 U.S., at 489, 92 S.Ct. 2593, 33 L.Ed. 2d 484, *Goldberg,* supra, 397 U.S. at 267–271, 90 S.Ct. 1011; *Dixon,* supra.

There will, however, be occasions when the state interests are so urgent that they cannot abide retention of the status quo pending this full hearing. Prompt, though temporary, suspension in advance of a full hearing must be permissible when the university has reasonable cause to believe that imminent danger to persons or property will exist if the student is permitted to remain on the campus pending the full hearing. Stricklin v. Regents of University of Wisconsin, 297 F.Supp. 416 (W.D.Wis. 1969), appeal dismissed as moot, 420 F. 2d 1257 (7th Cir. 1970); *Morrissey,* supra, 408 U.S. at 485, 92 S.Ct. 2593; *Fuentes,* supra, 407 U.S. at 96–97; Sniadach v. Family Finance Corp., 395 U.S. 337, 343, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1968). Of course, as the cited cases indicate, the ability to deprive temporarily is not unrestricted by due process. Rather, there must, absent unusual circumstances, see *Fuentes,* 407 U.S. at 90–93, 92 S.Ct. 1983; *Stricklin,* supra, 297 F.Supp. at 420; and discussion *infra,* be a preliminary hearing at which that reasonable cause is established. The exact nature of that hearing is more difficult to describe generally, given the numerous variations of time, place, numbers and danger. However, it should suffice to say that a prompt, informal preliminary hearing must be held at which the student is provided with notice of the charges, the specific, previously promulgated regulations under which the charges are brought, the issue for decision at that preliminary hearing, and his right to a prompt, full hearing

not to exceed 30 days); Fielder v. Board of Education of School District of Winnebago, 346 F.Supp. 722 (D.C.Neb.1972) (30 days suspension); Graham v. Knutzen, 351 F. Supp. 642 (D.C.Neb.1972) (60 days suspension); Williams v. Dade County School Board, 441 F.2d 299 (5 Cir. 1971) (40 days suspension); Tate v. Board of Education of Jonesboro, Arkansas, Special School District, 453 F.2d 975 (8 Cir. 1972) (5 days suspension); Linwood v. Board of Education of City of Peoria, 463 F.2d 763 (7th Cir. 1972) (7 days dispension); Dunn v. Tyler Independent School District, 460 F.2d 137 (5th Cir. 1972), aff'g in part and modfg. in part, 327 F.Supp. 528 (D.C.Tex.1971); Pervis v. La Marque Independent School District, 466 F.2d 1054 (5th Cir. 1972) (suspended for about 90 days).

later and at which both the student and the accusing university officials and witnesses should be allowed to present whatever evidence they have which can be promptly heard, with retained counsel to be permitted if his or her attendance does not unduly delay the hearing.

The need for such a preliminary inquiry is exemplified by the facts of this case. On November 17, plaintiff Bosque was summarily suspended for 20 days for the library incident as to which the Disciplinary Board found no violations. As to the events of November 29 and 30, the Board only found a violation in his participation in university affairs while under a suspension it found improper. Thus, there was in fact no basis for the suspension of this plaintiff for the period between November 17 and December 2, the date of the meeting interruption incident. Had a preliminary hearing of the nature just described occurred on November 17, this unlawful suspension, with its temporary deprivation of educational opportunities, permanent record stigma, and possibly provocative effect on this plaintiff, would probably never have taken place.

Clearly, even such an informal preliminary hearing will not be immediately possible in all cases. Under extraordinary circumstances of extreme danger or other overriding governmental concerns, "a special need for very prompt action" may arise rendering a prompt preliminary hearing impossible. *Stricklin,* supra, 297 F.Supp. at 420; *Fuentes,* supra, 407 U.S. at 91, 92 S.Ct. 1983. When such extreme exigencies occur the preliminary hearing should, of course, be held at the first time after the circumstances rendering it impossible disappears.

Of course, our definition of the minimum standards of procedural due process is not designed as the description of the only salutary standards. Sound educational policy will no doubt move any public educational institution to accord students other procedural guarantees. Our decision merely establishes the minimum protection constitutionally required.

In view of our present disposition in relation to the unconstitutionality of Article 16 of the General Rules and Regulations as it stands today, we deem it unnecessary to pass upon plaintiffs' collateral argument that their summary suspension violated their rights to freedom of speech and freedom of assembly; and that the same constituted a cruel and unusual punishment.

2. *Challenge to Article 3C(2)(a) and Article 10A(7)*

With regard to both the library incident of November 16 and the demonstration outside the Administration Building on December 8, the University invoked and the Disciplinary Board found violations of Article 3C(2)(a) and Article 10A(7). Plaintiffs assert that the regulations call for unconstitutional prior restraints and hence are violative of their free expression rights. Since they attack these regulations for interference with First Amendment rights, they may challenge them on their face, whether or not their own conduct could have been regulated by more narrowly drawn proscriptions. Grayned v. City of Rockford, 408 U.S. 104, 114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).[14]

Article 3C(2)(a) provides that: "The holding of pickets, marches, meet-

14. We therefore need not decide whether the University could properly bar all speeches within the confines of a library. We note that to date the University has not so chosen—its absolute bar on activities within university buildings being limited to "pickets or marches", Article 3C(2)(e), and thus not covering the "meetings and other demonstrations" regulated by 3C(2)(a). Indeed, the exact limits to which public authorities may go in restricting expressive activities even within such a sanctuary of silence as a library are far from clear. See Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966).

ings and other demonstrations at any place within the University will require prior notification and consultation of the Chancellor . . . [or his delegate] who will approve the place, hour and the day in which these acts will be carried out in such a way that they will not interrupt the educational tasks and the good order of the University." Initially, we would be inclined to read these regulations extremely narrowly to avoid any possible constitutional difficulty. Thus, the requirement of advance "consultation" might be read literally to demand merely an informal conversation, however brief, with the relevant authority regarding the manner in which the event will occur, without requiring that an agreement be reached and the official's approval be granted. The language of the regulations, however, prevents such a reading. First, such an interpretation would render the "consultation" requirement redundant—amounting to no more than the "notification" already required. More importantly, 3C(2)(f), dealing with mass pickets, speaks of "the permits to be issued", and the general conclusion to the entire regulation states that "The issuance of any permit under these regulations will not be utilized as an instrument for censorship." These phrases make explicit what is implicit in (2)(a)'s definition of consultation—that the holding of any of the events listed is prohibited without advance approval of the relevant University authorities. Whatever doubts might remain are fully dispelled by the absolute prohibition in 10A(7) of "The carrying out, within the University, of acts not authorized by the corresponding University officials." These two apparently overlapping and redundant regulations are thus clearly prior restraints on, i. e., requirements for advance approval of, the exercise of First Amendment rights anywhere within the University.

The teaching of New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), thus comes into play: "'Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity' . . . The Government 'thus carries a heavy burden of showing justification for the imposition of such a restraint.'" *Id.* at 714, 91 S.Ct. at 2141. If the significant interests of national security protection of diplomatic confidences, and safe-guarding soldiers' lives, invoked in *New York Times*, were not adequate justification for the prior restraint of the rights of a free press to publish a broad range of materials (the so-called Pentagon Papers), the revelation of some of which even members of the majority thought would do "substantial damage" to those interests, *id.* at 731, 91 S.Ct. 2140, then it is difficult to perceive how the need for traffic control, space allocation, and the minimization of noise and other disruptions of university activities can be adequate justification for a prior restraint on demonstrations of all kinds everywhere within the University. Indeed, the Supreme Court has repeatedly struck down licensing schemes without specific standards regarding the time, place and manner of events to be permitted because of their invidious threat to and invasion of the fundamental rights of free expression. Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Staub v. City of Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948). See also Police Dept. of Chicago v. Mosley, 408 U.S. 92, 97, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953); Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280 (1951). Given "the concededly extraordinary protection against prior restraints", *New York Times*, supra, 403 U.S. at 730–731, 91 S.Ct. at 2150 (White, J., concurring), we do not see how these regulations can stand. See Hammond v. South Carolina State College, 272 F.Supp. 947 (D.S.C.

1967); Fujishima v. Board of Education, 460 F.2d 1355 (7th Cir. 1972). See also Note, Prior Restraints in Public High Schools, 82 Yale L.J. 1325 (1973).

Moreover, even were some prior restraints to be permissible within a university in certain extremely limited circumstances, for example when material disruption is clearly predictable, these regulations are grossly overbroad, sweeping within their net both the perfectly harmless—a single, silent protester holding a sign in the middle of the campus in mid-day—and the extremely dangerous. Such broadside attacks on the rights of free expression are repugnant to our constitutional scheme. See Jones v. Board of Regents of University of Arizona, 436 F.2d 618 (9th Cir. 1970).

3. *Challenges to Article 10A(4) and (6) and Article 3C(2)(b)*

Plaintiffs challenge these regulations as both vague and overbroad. Though we hold their attack successful as to both 3C(2)(b) and 10A(4), we find that under governing precedent 10A(6) withstands their assault.

Initially, we are confronted with a question regarding the proper vagueness standard to apply to university regulations.[15] We think the suggestion that the standard should be different from those applied to criminal statutes is without foundation. First, the Supreme Court has from the beginning refused to apply different standards to civil enactments. "The ground or principle of the [earlier vagueness] decisions was not such as to be applicable only to criminal prosecutions. It was not the criminal penalty that was held invalid, but the exaction of obedience to a rule or standard which was so vague and indefinite as really to be no rule or standard at all." A. B. Small Co. v. American Sugar Refining Co., 267 U. S. 233, 239, 45 S.Ct. 295, 297, 69 L.Ed. 589 (1925). And it has recently reaffirmed that "the 'void for vagueness' doctrine [is] applicable to civil as well as criminal actions." Boutilier v. INS, 387 U.S. 118, 123, 87 S.Ct. 1563, 1566, 18 L.Ed.2d 661 (1967).

Second, the policies underlying the doctrine are as applicable to civil enactments and to university rules as they are to criminal prohibitions. There are three basic policies: to provide fair warning to those governed by the rule, to guide the officials enforcing the rule thus preventing arbitrary or discriminatory enforcement, and to prevent infringement upon constitutionally protected activity. Grayned v. City of Rockford, 408 U.S. 104, 108–109, 92 S. Ct. 2294, 33 L.Ed.2d 222 (1972). Self-evidently all three purposes are fostered when the doctrine is applied to rules governing the conduct of students on a university campus. Indeed, two of them would seem to apply with particular force in the college setting. Given the experimental spirit and dissenting viewpoints of the young, college campuses display a greater diversity of life-styles than found in the society as a whole. Thus the shock and affront to the enforcing officials is likely to be greater

15. The issue of whether the standards of vagueness apply to university regulations has been a matter of concern to federal courts in recent years and the approach to the issue has been quite ambivalent. Compare Esteban v. Central Missouri State College (D.C.Mo.1968), 290 F.Supp. 622, affd. (8 Cir. 1969), 415 F.2d 1077, cert. den. 398 U. S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970), and Papish v. Board of Curators of University of Missouri (D.C.Miss.1971), 331 F.Supp. 1321, affd. (8 Cir. 1972), 464 F.2d 136, with Soglin v. Kauffman (D.C.Wis. 1968), 295 F.Supp. 978, affd. (7 Cir. 1969), 418 F.2d 163; Sword v. Fox (D.C.Va.1970), 317 F.Supp. 1055, 1062, rev. on other grounds (4 Cir. 1971), 446 F.2d 1091, 1099, cert. den. 404 U.S. 994, 92 S.Ct. 534, 30 L. Ed.2d 547; and Sill v. Pennsylvania State University (D.C.Pa.1970), 318 F.Supp. 608, affd. (3 Cir. 1972), 462 F.2d 463. For a critical evaluation of the cases of *Esteban* and *Soglin*, supra, see Note, The Constitutional Standards for the Content of College Disciplinary Regulations 1971, University of Ill.L.F. 256. See also Comment, School Regulations and the Rule Making Power of the University, 15 St. Louis Univ.L.J. 467 (1971).

and consequently the potential for discriminatory enforcement enhanced. Similarly, the political ferment and activism recently so common on university campuses suggest that the vagueness doctrine is peculiarly necessary to insure full protection for the exercise of guaranteed rights of expression. See Note, Bringing the Vagueness Doctrine on Campus, 80 Yale L.J. 1261 (1971).

Finally, a comparison of the penalties actually imposed in different circumstances indicates the illogic of a criminal-civil or society-university distinction. In *Grayned,* where the Court fully applied the vagueness doctrine, the appellant was only fined $25.00 for the ordinance conviction he challenged. In Giaccio v. Pennsylvania, 382 U.S. 399, 86 S. Ct. 518, 15 L.Ed.2d 447 (1966), the Court applied the vagueness doctrine to a state rule defining the circumstances under which a jury could assess costs against an acquitted misdemeanor defendant, in a case where costs of $230.95 were imposed. It should be evident that a year's suspension from college could well have a far more devastating and long-term effect on the reputation, career, and hence finances of an individual than an assessment of costs after a criminal acquittal or a conviction under an anti-noise ordinance and a fine of $25. For all of these reasons, we believe that the normal vagueness standards apply to university regulations.

Turning to the merits of the vagueness challenge, we have no difficulty in finding Article 10A(4) clearly inadequate. It purports to prohibit: "Improper or disrespectful conduct in the classroom or campus." We find it hard to distinguish these terms from the words "reprehensible" and "improper" found impermissibly vague in Giaccio, the phrase "annoying to persons passing by" struck down in Coates v. Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), and the all-encompassing ban on "misconduct" rejected in Soglin v. Kauffman, 418 F.2d 163 (7th Cir. 1969). The inadequacy is obvious—the purpose of a prohibitory rule is to inform those affected what is improper not merely that the "improper" is prohibited.

The other two regulations present quite different situations. 10A(6) makes it impermissible "To interrupt, hinder, or disturb the regular tasks of the University or the holding of duly authorized activities." 3C(2)(b) requires that "The acts referred to [in 3C(2)(a)] will be held 'in such a manner' that they will not affect the normal functioning of the University's operations and proceedings." The relevant precedent is *Grayned.* The Court there upheld against a vagueness challenge an ordinance punishing one who "shall willfully make or assist in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof." 408 U.S. at 108, 92 S.Ct. at 2298. It did so, however, only because of judicial interpretations which made it clear that the term "tends to disrupt" means only "imminent interference" with the school's order and a conviction could lie only if the diversion was "actually incompatible with normal school activity", there was a "demonstrated causality" between the disruption and the diversion and "the acts were willfully done." *Id.* at 111–114, 92 S.Ct. 2294. Article 10A(6) uses the very verb "disturb" approved by the Court in *Grayned.* The other verbs seem to us to be of equal if not greater specificity—speaking to behavior which not merely disturbs but is so incompatible with the university activity as to cause a complete interruption or a temporary retarding interference. These terms dictate actual incompatibility, demonstrated causality, and willfulness (though we do not mean to imply that the standards of intent required for a criminal conviction apply here).

In sharp contrast is Article 3C(2)(b). It bars only activities that "affect the normal functioning" of university activities. The breadth of the term "affect" suggests its indefiniteness. Does it cover a silent picket

whose sign causes the passing reader to reflect on its message; does it include a statement in a class which causes an abnormally interested conversation among fellow classmates; is a meeting advocating research into university contact with the military which produces abnormally high attendance at the library encompassed? Moreover, what of the inadvertent dropping of a pen which causes several heads to turn or a quiet huddle on campus which attracts undesired participants. Though we are not unmindful of the limitations of language, we think that Article 3C(2)(b) too loosely defines the conduct which it seeks to avoid, and which is far more sharply described by the nearly entirely overlapping Article 10A(6).

We come to similar conclusions regarding the overbreadth of these regulations. As *Grayned* reaffirmed, public authorities may regulate the time, place and manner in which the rights of free expression are exercised, consistent with a narrow definition of public order. "Expressive activity could certainly be restricted, but only if the forbidden conduct 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" 408 U.S. at 118, 92 S.Ct. at 2304, quoting from *Tinker,* supra, 393 U.S. at 513, 89 S.Ct. 733, 21 L.Ed.2d 731. While Article 10A(6) lacks the specificity of time and place found in the *Grayned* ordinance's reference to the school session and adjacency to the school building, we think its reference to "regular tasks" and "duly authorized activities" is adequate limitation of its prohibition to activity which materially disrupts and is actually incompatible with classes, meetings, and other organized, official, university activities. Contrastingly, Article 3C(2)(b) covers all activities which in any way affect what is described as the normal functioning of those university activities. Even if that regulation has sufficiently definite meaning, it impermissibly encompasses both the materially disruptive and the minimally distracting.

4. *Article 10A(1)*

This regulation subjects to disciplinary sanctions "Violations to the Student's General Regulations or to the Campus Regulations." The purpose of this regulation is difficult to comprehend. It would appear solely to create two violations out of every prohibited act. We need not consider, however, whether this creates an impermissible double punishment. Nor need we consider whether its use in connection with the election activities of plaintiff Bosque was proper, though we are pointed to no regulation which specifically bars participation in university activities when under suspension. Rather, since the sole incident in which this regulation was found to be the only one violated was the election activity of Bosque and since that violation explicitly hinged on his original summary suspension which we have previously held unconstitutional, it is sufficient to hold that the Board's finding of a violation of 10A(1) regarding Bosque's election activities on November 29 and 30, 1971 must be voided, because founded on an unconstitutional premise.

In summary, we hold that the summary suspension provisions of Article 16 are unconstitutional for failing to provide the required advance procedures, that Article 3C(2)(a) and 10A(7) are unconstitutional as overbroad prior restraints, that Article 10A(4) and Article 3C(2)(b) are impermissibly vague and the latter overbroad as well, and that Article 10A(6) is neither vague nor obooverbroad. Although the Disciplinary Board found violations of 10A(6) as to several incidents, we must void both plaintiffs' suspensions in their entirety because they rested on findings of violations of several other regulations we have found unconstitutional.

Accordingly, we declare Article 16, Article 3C(2)(a) and (b) and Article 10A(4) and (7) unconstitutional on their face, declare Article 10A(6) neither impermissibly vague nor overbroad, declare both the summary and final suspensions of these plaintiffs void and

null, and enjoin defendants to expunge all reference to these suspensions from the university records of the plaintiffs. We do not at the present time enjoin the enforcement of the regulations we have found invalid both because we are confident that the University will heed our declaratory judgment and in order to give the University time to draft new regulations to satisfy the holdings of this case.

## ON MOTION FOR REHEARING

### ORDER

This cause is before the Court pursuant to defendant University of Puerto Rico's motion for rehearing, motion to amend judgment and motion to dismiss for lack of jurisdiction filed on July 23, 1973, and plaintiffs' opposition to the same, as well as upon plaintiffs' motion for reconsideration of July 30, 1973.

Defendant University of Puerto Rico's motion for rehearing is similar to a motion to dismiss for lack of jurisdiction it filed on March 12, 1973, basically predicated upon the holdings of District of Columbia v. Carter, 409 U.S. 418, 93 S. Ct. 602, 34 L.Ed.2d 613 (1973) and Katzenbach v. Morgan, 384 U.S. 641, 86 S. Ct. 1717, 16 L.Ed.2d 828; motion which we disposed of in our Opinion of July 18, 1973. It asserts that this Court, in denying its motion of March 12, 1973, did not decide that Puerto Rico was either a state or a territory for purposes of Title 42, United States Code, Section 1983 actions; and that by distinguishing the *Carter* decision, this Court expanded the scope of the mentioned statute to situations not sanctioned by Congress. It further asserts that we failed to recognize that the unique historical relationship between Puerto Rico and Congress is similar to the unique relationship of Washington, D. C. and Congress. Finally, the mentioned motion submits that the legislative and judicial powers of the Commonwealth of Puerto Rico are fully equipped to afford protection against officials who might deny citizens their constitutional rights.

In relation to movant's stress upon our failure to express whether Puerto Rico is a territory or a state for purposes of Section 1983, it suffices to say that such a determination is immaterial when faced with the contention that the *Carter* decision deprives this Court of jurisdiction to entertain this cause under said section and its jurisdictional counterpart Title 28, United States Code, Section 1343. The only relevant consideration is whether the considerations leading to the *Carter* decision are present in the relationship between Puerto Rico and Congress. In our opinion of July 18, 1973, we found they were not present, but that to the contrary, the rationale behind the civil rights act is as fully applicable to the Commonwealth of Puerto Rico as it is to any state of the Union or to the Virgin Islands. We need not go any further. Puerto Rico's unique historic relationship with Congress is in no way a bar to an action under the mentioned statute.*

We are also of the opinion that by distinguishing the *Carter* decision we in no way have expanded the scope of Section 1983 of the Civil Rights Act. Finally, the judicial powers of the Commonwealth of Puerto Rico cannot afford, because of a legislative enactment (the anti injunction statute, Title 32, Laws of Puerto Rico Annotated, Section 3524), any protection to plaintiffs, when as in this case, officials of the Commonwealth of Puerto Rico denied them their constitutional rights acting pursuant to authority granted by the General Rules and Regulations attacked in this cause. See Marin v. University of Puerto Rico (D.C.P.R.1972), 346 F.Supp. 470, 479.

* We have at various times recognized the applicability of the statute to Puerto Rico. See e. g. El Mundo v. P. R. Newspaper Guild (D.C.P.R.1972), 346 F.Supp. 106; Santiago v. Torres-Massa (D.C.P.R.1972), 342 F.Supp. 1152; Vistamar, Inc. v. Vazquez (D.C.P.R.1971), 337 F.Supp. 375; Glenwal Development v. Schmidt (D.C.P.R.1972), 336 F.Supp. 1079.

Defendant University of Puerto Rico's motion to amend judgment submits that it is not a "person" under Title 42, United States Code, Section 1983 and, therefore, the complaint fails to state a claim upon which relief can be granted against it. Such proposition is said to be predicated in the holdings of Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973) and Conway v. Alfred I. Dupont School Dist. (D.C.Del.1971), 333 F.Supp. 1217.

It is this Court's opinion that University of Puerto Rico's motion is untenable. The Supreme Court in the recent *Moor* decision, reasserted its position that Congress did not intend to render municipalities or municipal corporations liable to federal civil rights' claims under Section 1983. See Monroe v. Pape, 365 U.S. 167, 187–191, 81 S.Ct. 473, 5 L.Ed.2d 492. It is without question that Congress does not intend to impose liability on political subdivisions of the states. Since school districts are a public or quasi-municipal corporation of the states, consistent with *Monroe,* supra, no cause of action lies against them under the Civil Rights Act. *Conway,* supra at 1218. The University of Puerto Rico does not fall within the doctrine set out in *Monroe,* supra, and reasserted in *Moor,* supra, since it is not a municipality, a municipal corporation or a political subdivision of the Commonwealth of Puerto Rico. On the contrary, it is a public corporation of the Commonwealth of Puerto Rico with statewide impact, under the control and budget of the Commonwealth of Puerto Rico.

Lastly, University of Puerto Rico's motion to dismiss for lack of jurisdiction of August 3, 1973, submits that the General Rules and Regulations approved by authority granted by Act #1 of January 20, 1966 (Title 18, Laws of Puerto Rico Annotated, Section 609), are not a "state statute" under Title 28, United States Code, Section 2281. This last proposition is predicated upon its submission that the holding of Mora v. Mejías (D.C.P.R.1953), 115 F.Supp. 610, can no longer stand in view of the expressions of the Supreme Court in Fornaris v. Ridge Tool Co., 400 U.S. 41 footnote 1, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970).

In relation to this last contention, it suffices to say that in no way the expressions contained in *Fornaris,* supra, footnote 1, alter or affect the holding of *Mora,* supra. In our opinion, it is clear that Section 2281 allows a three judge federal court to have jurisdiction in cases involving an order made by an administrative board under a Puerto Rican statute. See Mongil Suarez v. Administrador del Deporte Hípico (D.C.P.R.1972), 354 F.Supp. 320.

Plaintiffs' motion of July 30, 1973, moves that we reconsider our Opinion of July 18, 1973, with respect to our finding that Article 10A(6) of the General Rules and Regulations of the University of Puerto Rico is not unconstitutionally deficient. This Court does not think that Article 10A(6) of the mentioned regulations is so vague and overbroad as to merit any reconsideration at this point.

In view of the foregoing, the Court hereby ORDERS that defendant University of Puerto Rico's motions of July 23, 1973 be and the same are hereby denied, and it is further

Ordered, that plaintiffs' motion of July 30, 1973, be and the same is hereby denied.

It is so ordered.

ON POST–JUDGMENT MOTION

Defendants herein have filed another post judgment motion in this protracted litigation attacking under Rule 12(b)(3) of the Federal Rules of Civil Procedure, this Court's jurisdiction to entertain plaintiffs' actions under Title 42, United States Code, Section 1983 and Title 28, United States Code, Section 2281.

It is defendants' contention that the mentioned Sections refer to "state statutes" and that under the holdings of Fornaris v. Ridge Tool Co., 400 U.S. 41, 42 n. 1, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970) and Palmore v. United States,

411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973), this Court lacked jurisdiction to declare unconstitutional the General Student Regulations of the University of Puerto Rico involved in this cause and, accordingly, should hold it is without jurisdiction in this cause.

Plaintiffs have. filed an opposition to defendants' request.

After due consideration of defendants' arguments and of plaintiffs' opposition, it is the opinion of this Court that defendants' motion is without merit.

Firstly, we must stress that defendants' use of the "state statute" argument indistinctively as to both Section 1983 of Title 42, United States Code and Title 28, United States Code, Section 2281 is mistaken. In Section 1983 the relevant phrase is not "state statute" but "state or territory" and we have disposed of defendants' jurisdictional argument with respect to that statute, in our Opinion of July 18, 1973, and in our Order of September 24, 1973.

In relation to the Section 2281 assertion, it could be sufficient to say that, even if defendants were to be successful in their argument, we could still entertain the action under Section 1983; and their contention would mean nothing more than that one judge could have decided and ordered what three have done.

Furthermore, it is our opinion that defendants' Rule 12(b)(3) motion is really a Rule 60(b)(4) motion seeking relief from judgment on the ground that the judgment is void. See 5 Wright & Miller, Federal Practice and Procedure, Section 1350, page 545. See also Lubben v. Selective Service System, Local Bd. No. 27 (1 Cir. 1972), 453 F.2d 645. "In the interest of finality, the concept of void judgments is narrowly construed. While absence of subject matter jurisdiction may make a judgment void, such total want of jurisdiction must be distinguished from an error in the exercise of jurisdiction. A court has the power to determine its own jurisdiction, and an error in that determination will not render the judgment void. Only in the rare instance of a clear usurpation of power will a judgment be rendered void." *Lubben,* supra. Here we had jurisdiction and we have in no way usurpated our power.

In view of the foregoing, the Court hereby

Orders that defendants' motion be and is hereby denied.

It is so ordered.